**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1050-ADA |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| BROADWAY NATIONAL BANK D/B/A BROADWAY BANK, | |
| Defendant. | |
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1051-ADA |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| CHARLES SCHWAB BANK, | |
| Defendant. | |
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1052-ADA |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| COMERICA BANK, | |
| Defendant. | |
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1053-ADA |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| FROST BANK, | |
| Defendant. | |

| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1054-ADA |
|---|---|
| Plaintiff,<br>v.<br>INDEPENDENT BANK,<br><br>Defendant. | **<u>JURY TRIAL DEMANDED</u>** |
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1055-ADA |
| Plaintiff,<br>v.<br>INTERNATIONAL BANK OF<br>COMMERCE,<br><br>Defendant. | **<u>JURY TRIAL DEMANDED</u>** |
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1056-ADA |
| Plaintiff,<br>v.<br>SOUTHSIDE BANK,<br><br>Defendant. | **<u>JURY TRIAL DEMANDED</u>** |
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1057-ADA |
| Plaintiff,<br>v.<br>TEXAS CAPITAL BANK,<br><br>Defendant. | **<u>JURY TRIAL DEMANDED</u>** |
| TEXTILE COMPUTER SYSTEMS, INC., | CIVIL ACTION NO. 6:21-cv-1058-ADA |
| Plaintiff,<br>v.<br>VANTAGE BANK TEXAS,<br><br>Defendant. | **<u>JURY TRIAL DEMANDED</u>** |

TEXTILE COMPUTER SYSTEMS, INC.,

     Plaintiff,

v.

WOODFOREST FINANCIAL GROUP,
INC., WOODFOREST FINANCIAL
SERVICES, INC., and WOODFOREST
NATIONAL BANK,

     Defendants.

CIVIL ACTION NO. 6:21-cv-1059-ADA

**<u>JURY TRIAL DEMANDED</u>**

## <u>TEXTILE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

## Table of Contents

I.    INTRODUCTION ................................................................................................. 1

II.   MR. NANDAKUMAR'S INVENTION ............................................................. 1

III.  THE COURT SHOULD ADOPT TEXTILE'S PROPOSED CONSTRUCTIONS ...... 2

      A.    claim preambles ............................................................................ 2

      B.    order of steps ................................................................................. 3

      C.    "[unauthorized] service client" ..................................................... 6

      D.    "secured resource" ...................................................................... 10

      E.    "messaging gateway" ................................................................... 11

      F.    "authorized user" ......................................................................... 12

      G.    "key string" .................................................................................. 14

      H.    "key string known to both said secured resource and the authorized user" /
            "key string known to both said server and an authorized user" ...................... 20

      I.    "key string [being] adapted to provide a basis for authenticating the
            identity of said requester" .......................................................... 21

      J.    "authentication credential" .......................................................... 23

      K.    "based upon passage of time" ...................................................... 25

      L.    "a service user interface in communication with said server…" ...................... 26

      M.    "primary identifier" .................................................................... 28

      N.    "receiving at a messaging gateway…" ........................................ 31

      O.    "common identifier" .................................................................... 32

IV.   CONCLUSION ................................................................................................. 33

**Table of Exhibits**

| Ex | Exhibit Description |
|----|---------------------|
| P1 | U.S. Patent No. 8,505,079 (to Nandakumar) |
| P2 | U.S. Patent No. 8,533,802 (to Nandakumar) |
| P3 | U.S. Patent No. 9,584,499 (to Nandakumar) |
| P4 | U.S. Patent No. 10,148,659 (to Nandakumar) |
| P5 | U.S. Patent No. 10,560,454 (to Nandakumar) |
| P6 | *Unified Patents Inc. v. Textile Computer Systems, Inc.*, IPR2017-00296, Paper 19, Final Written Decision (PTAB Mar. 23, 2018) ("IPR FWD") |
| P7 | U.S. Patent Publication No. 2010/0241595 ("Felsher") |
| P8 | U.S. Patent Publication No. 2009/0164373 ("Blythe") |
| P9 | *Unified Patents Inc. v. Textile Computer Systems, Inc.*, IPR2017-00296, Paper 13, Patent Owner Response (PTAB Aug. 14, 2017) ("IPR POR") |
| P10 | Barron's Dictionary of Computer and Internet Terms (7th Ed.) at 202 ("gateway"); TCS_CC_000001 – TCS_CC_000003. ("Barron's") |
| P11 | U.S. Patent Publication No. 2009/0119194 ("Chau") |
| P12 | *Unified Patents Inc. v. Textile Computer Systems, Inc.*, IPR2017-00296, Paper 21, Decision on Request for Rehearing (PTAB May 18, 2018) "IPR Rehearing" |
| P13 | U.S. Patent Publication No. 2012/0151567 ("Chyanam") |
| P14 | U.S. Patent Publication No. 2009/0076966 ("Bishop") |
| P15 | U.S. Patent Publication No. 2012/0018506 ("Hammad") |
| P16 | U.S. Patent Publication No. 2011/0125638 ("Davis") |
| P17 | U.S. Patent Publication No. 2008/0098464 ("Mizrah") |
| P18 | U.S. Patent Publication No. 2012/0144468 ("Pratt"), |
| P19 | The American Heritage Dictionary of the English Language (3rd Ed. 1992) at p. 438 ("credential"); TCS_CC_000008 – TCS_CC_000009, TCS_CC_000012, , TCS_CC_000014.  ("Am. Her.") |

| P20 | Webster's Encyclopedic Unabridged Dictionary of the English Language (1996) at p. 473 ("credential"); TCS_CC_000020 – TCS_CC_000021, TCS_CC_000024, TCS_CC_000027. ("Webster's Encyc.") |
|---|---|
| P21 | 079 File History June 6, 2013 Notice of Allowance ("079 NOA") |
| P22 | 802 File History June 6, 2013 Notice of Allowance ("802 NOA") |
| P23 | 499 File History, June 15, 2016 Amendment and Reply ("499 Resp.") |
| P24 | 499 File History, July 15, 2016 Office Action ("499 OA2") |
| P25 | Screenshot of Results for "key string" search ("Screenshot")) |
| P26 | 499 File History, Dec. 16, 2015 Office Action ("499 OA1") |

## I.      INTRODUCTION

Mr. Gopal Nandakumar is a pioneer in the field of payment systems, having been awarded numerous patents for his innovations.  This case involves his innovative digital wallet tokenization systems and methods, which he designed—and patented—*years* before the defendant banks began using digital wallet tokenization for their issued credit cards.  Mr. Nandakumar even reached out to many entities in the payments industry (including some of the defendant banks) to share the news about the systems and methods that he designed and patented.

Defendants now ask the Court for a series of constructions that fail to track what Mr. Nandakumar told the Patent Office he invented (in the language he chose for his claims, in the description he provided in his patent specifications, and in disclaimers he expressly made to the Patent Office during prosecution).  Defendants also assert that multiple claims are indefinite based on faulty readings of the claims that are divorced from how an ordinary person of skill in the art—and in fact, how any ordinary, reasonable person—would read the claims.  The Court should reject defendants' proposed constructions and indefiniteness arguments.

## II.     MR. NANDAKUMAR'S INVENTION

Before Mr. Nandakumar's invention, a typical credit card transaction would work in the following way: a customer ("Bob"), would hand over his credit card to an employee at a restaurant.  The restaurant would take physical possession of the card, swipe it in a point of sale system, and send a request to the bank for payment using Bob's credit card number. The bank would then provide the funds to the restaurant.  Many credit-card transactions still



occur in this way.

Mr. Nandakumar saw the security risks in this way of conducting credit card transactions, including that the restaurant, its employees, and any bad actors or hackers may have access to the actual credit card number.  Such risks needlessly led to billions of dollars in credit card theft and fraud.  Mr. Nandakumar set out to design a system and method that removes the actual credit card number (and thus any risks from it being exposed) from the equation.  In Mr. Nandakumar's system, the user communicates with the bank to set up a correspondence with his actual credit card number.  The bank then sends the user's mobile device a number, called a token, that corresponds to the actual credit card number.  The bank and the mobile device also establish an encryption key associated with that credit card and that particular mobile device, and the encryption key is used to generate transaction-specific cryptograms.

Thus a central goal of Mr. Nandakumar's inventions—and a key aspect of every claim of Mr. Nandakumar's patents—is that the credit card number (or whatever other information is being protected by using his patented system) not be provided to the merchant.  Mr. Nandakumar's invention allows transactions to be approved *without the actual credit card number* (a common identifier) being *provided or revealed to the restaurant/merchant* (a service client).

## III.   THE COURT SHOULD ADOPT TEXTILE'S PROPOSED CONSTRUCTIONS

### A.   claim preambles

| Term | Agreed Construction |
|---|---|
| claim preambles | *The preambles are non-limiting.* |

Narrowing the disputes before the Court, Textile agrees with defendants that "the Court should construe the preambles as non-limiting."  Def. Open. CC Brief at 2.

### B.     order of steps

| Term | Textile's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| order of steps in method claims | *No order is required (other than that inherently required by the claim limitations).* | *Each method claim must be performed in the order of operation claimed.* |

Steps of a method claim should be construed to be required to be performed in order only if (1) they expressly use temporal words such as "next," "during," "after," *etc*.; (2) the specification or prosecution history includes disclaimers requiring an order that trumps claim language that does not otherwise require an order; or (3) the logic of the claim steps inherently require them to be performed in order.  *See, e.g., Altiris Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003).

Defendants do not argue that (1) or (2) apply here and Textile agrees that they do not. Defendants argue only (3), that certain steps of the method claims must—as a matter of logically necessity—be performed in order.  *See* Def. Open. CC Brief at 2-4.  Textile acknowledges that there are certain instances in which the logic of its method claims inherently require certain steps to be performed in order.  For example, Textile agrees that the step of "[a] providing at least one interface" of claim 1 of the 659 Patent must inherently occur before the step of "[b] receiving registration information . . . through the at least one interface" since the user interface obviously cannot be used until it is provided.  Textile agrees with defendants that the following orders are inherently required:

    079 Patent, Claim 11:  [c] before [d].
    802 Patent, Claim 11:  [b] before [c]; [d] before [e].
    499 Patent, Claim 1:   [a] before [c] and [d]; [d] before [e].
    499 Patent, Claim 3:   [a] before [c]; [b] before [d]; [e] before [f].
    659 Patent, Claim 1:   [a] before [b], [c], and [e]; [c], [d], and [e] before [f].
    454 Patent, Claim 1:   [a] before [b], [c], and [e]; [c], [d], and [e] before [f].

(The step labels [a], [b], [c], etc., are those defendants added to the claims in their Exhibit 20—

they are not part of the claim language.)  But it is unnecessary for the Court to instruct the jury that these orders are required since they are already manifest from the plain language of the claims.  *See, e.g., Famosa, Corp. v. Gaiam, Inc.*, No. 11 Civ. 05703 (KBF), 2012 WL 865687 at *2 (S.D.N.Y. Mar. 14, 2012) ("While it is a court's job to elaborate on claim language that can sometimes be terse and/or difficult to parse, its need not—and should not—construe language that is clear on its face.").

Beyond these areas of agreement, defendants' proposed construction—which would require every step of every method claim to be performed in absolute order—should be rejected for two reasons.

First, in many instances, defendants' specific arguments that certain steps must be performed in order as a matter of logical necessity are plainly wrong (and completely unsupported):

*659 Patent, Claim 1, [b] before [c]:*  Defendants say this order is required because step [c] requires receiving a request message that contains certain identifiers that are "identified by the registration information in step [b]."  Def. Open. CC Brief at 3.  But registration step [b] does not require information to be "identified" at all—that is just made up.  Rather, step [b], like step [c], simply requires certain identifiers to be received (as part of the registration information that is received in step [b] and as part of the authorization request message received in step [c].)  There mere fact that certain information must be received as a part of step [b] and as a part of step [c] in no way logically necessitates that one step must be performed before the other.

*659 Patent, Claim 1, [c] before [d]:*  Defendants say this order is required because step [d] requires receiving a first transaction specific authentication credential that is associated with the authorization request "and that can only be done after the authorization request is received"

in step [c]. Def. Open. CC Brief at 3. That bare assertion is not only unsupported, it is illogical: there is no reason why an X that is associated with a Y cannot be received before the Y is received. For example, it would obviously be possible for me to *first* tell my IT guy my user name for logging on to my laptop (which is associated with my password) and *then* tell him my password so that he can complete the logon.

*454 Patent, Claim 1*: Defendants assert only that this claim recites "substantially similar limitations" as claim 1 of the 659 Patent and that therefore an absolute order of steps is required. Def. Open. CC Brief at 4. But as explained above, defendants are wrong about the orders that are logically necessitated by claim 1 of the 659 Patent.

*802 Patent, Claim 11*: Defendants merely list the steps of this claim and assert in conclusory fashion that they must all occur in absolute order. Def. Open. CC Brief at 4. While Textile agrees that [b] must occur before [c] and that [d] must occur before [e], there is nothing about the claim language that logically requires any other step to be performed in order. Defendants have not even attempted to show otherwise.

*079 Patent, Claim 11*: Defendants assert in conclusory fashion that this claim is the same as claim 11 of the 802 Patent and that the every step must be performed in absolute order. Def. Open. CC Brief at 4. While Textile agrees that step [c] must occur before [d], there is nothing about the claim language that logically requires any other steps to be performed in order. Defendants have not even attempted to show otherwise.

*499 Patent, Claim 1*: Defendants merely list a subset of the steps of this claim and assert in conclusory fashion that every step must be performed in absolute order. Def. Open. CC Brief at 4. While Textile agrees that step [a] must occur before steps [c] and [d], and that step [d] must occur before step [e], there is nothing about the claim language that logically requires any other

steps to be performed in order.  Defendants have not even attempted to show otherwise.

*499 Patent, Claim 3*:  Defendants did not even address this claim.  Textile agrees that step [a] must occur before step [c]; that step [b] must occur before step [d]; and that step [e] must occur before step [f].  But there is nothing about the claim language that logically requires any other steps to be performed in order.

The second reason defendants' proposed construction should be rejected is that it does not follow from the fact that *some* steps must inherently be performed in order that *every* step must be performed in order.  Yet based on their arguments that some steps must be performed in order, defendants ask the Court to construe every method claim to require every step to be performed in order.  Defendants have not provided any legal authority—or even any reasoned analysis—that could possibly support that result.

**C.    "[unauthorized] service client"**

| Term | Textile's Construction | Schwab's Construction | Non-Schwab Defendants' Construction |
|---|---|---|---|
| [unauthorized] service client | [unauthorized] retail store, service station, on-line service provider or merchandiser, healthcare provider, medical insurer, information consumer, or the like<br><br>*The claimed system/method must restrict the service client from access to the common identifier for the secured resource.* | Service client: A client program, software, or application that receives access to a secured resource.<br><br>Unauthorized service client: A service client that uses an authentication credential instead of a common identifier to access the secured resource. | An [unauthorized] entity that can request access to a secured resource |

The Court should adopt Textile's proposed construction because it tracks the definitional language provided by the specifications of the patents-in-suit and because it incorporates the

disclaimer that was made repeatedly by Mr. Nandakumar in order to secure allowance of his patents.

The specifications of the patents-in-suit define a "service client" by providing examples of entities for whom an authorized user might wish to provide access to a secured resource, but without providing the common identifier of the secured resource:

SUMMARY OF THE INVENTION

\*     \*     \*

> Another embodiment of the present invention generally comprises a means for receiving from *a service client (such as, for example, a retail store, a service station, an on-line service provider or merchandiser, a healthcare provider, a medical insurer, an information consumer or the like)* a request for access to a secured resource . . . .

499 Patent at 2:33-41.  And they each make expressly clear that the system must operate in a manner that prevents the service client from receiving the common identifier of the secured resource:

> *In a critical aspect* of the authentication system 30 and method 46 of the present invention, an additional security measure is implemented *by requiring that the service client 33 be restricted from access to the common identifier for the secured resource, e.g.* the account number for a credit card or financial deposit account; the Social Security Number of a patient; the account number of an ATM card; or the like.

Ex. P1, 079 Patent 8:4-10; Ex. P2, 802 Patent 8:4-10; Ex. P3, 499 Patent 51:18-25 (emphasis added).  This was also expressly confirmed during the IPR of the 079 Patent:

> Moreover, based on the disclaimer explained above, we agree with Patent Owner and Mr. Oglesby that *the claimed system and method must operate in a manner so that the "key string" does not reveal a common identifier of the secured resource to the unauthorized service client*.

Ex. P6, IPR FWD at 20 (emphasis added).  Textile's construction is correct because it tracks both the definition provided by the specifications, as well as the disclaimer that the service client must be restricted from accessing the common identifier of the secured resource.

7

Defendants primarily criticize Textile's proposed construction because it uses a list of examples to explain to the jury what qualifies as a "service client."  Def. Open. CC Brief at 5-6. That criticism should be rejected by the Court for multiple reasons.

First, construing terms by providing examples can be helpful in appropriate circumstances, particularly when that is the approach the patent specifications take.  *See, e.g., Apple Inc. v. Samsung Elecs. Co. Ltd*., 11-cv-1846, 2012 WL 2993856, *4 (N.D. Cal. July 20, 2012) ("[T]he Court finds that the additional examples from the specification that may be given to the jury will aid the jury in understanding what an electronic document is.").  Indeed, as the Court will see for the next disputed claim term, defendants took this approach when they thought it was appropriate.

Second, if there is any dispute about whether things like retail stores or service stations qualify as unauthorized service clients, that dispute should be joined and resolved now as part of *Markman*.

Third, defendants' criticism that Textile omitted "physical locations" from the list of examples is simply wrong—the patents never describe a physical location as an example of a service client.  (It is an example of a secured resource.)  True, Textile's patents do in certain places mention more specific examples of retail stores and service clients, such as restaurants and automobile dealerships.  But those are already encompassed by the categories set forth in Textile's proposed construction.  In any event, if their omission is really what concerns defendants, Textile would not object to their addition.

Defendants also criticize Textile's proposed construction because it fails to provide a generic statement of "*what* a 'service client' actually *is*."  Def. Open. CC Brief at 5.  But if a generic statement is really necessary, no words are needed beyond "service client"—which

8

plainly refer to a client in a server-client paradigm.  Indeed, one of the defendants propose

repeating the word "client" in their affirmative statement of what a "service client" actually is!

Beyond that, defendants make changes or add qualifications that are not completely accurate.

For example, does Schwab contend that to be a service client, the client must actually receive

access to the secured resource?  That would be incorrect since Textile's patent claims are written

so that they can be infringed whether or not the request for access is ultimately granted.   Does

Schwab intend to distinguish between software and hardware implementations by its

construction?  There is no basis for any such distinction.  Similarly, do the other defendants

intend by "entity" to exclude point-of-sale terminals that would be used by an entity to process

transactions?  That too would be incorrect since the patents-in-suit clearly contemplate computer

devices performing the various roles set forth in the claim language.    Defendants' glosses

describing "*what* a 'service client' actually *is*" are unhelpful and serve only to raise additional

disputes about the scope of the limitations.

Finally, defendants' criticize Textile's inclusion of the disclaimer restricting the service

client from having access to the common identifier of the secured resource.  Def. Open. CC Brief

at 6.  Defendants first assert in conclusory fashion that "[t]here is no basis to import this

limitation into this claim term."  *Id*.  But defendants simply ignore the express disclaimer

discussed above that was made both in the specification of every patent-in-suit and during the

IPR of the 079 Patent.  Defendants also criticize Textile's inclusion of the disclaimer because it

uses a phrase ("common identifier") that is not used in some of the claims.  *Id*.  But there is

nothing wrong with using new words in claim constructions.  *See, e.g., Techtronic Indus. Co.*

*Ltd. v. Int'l Trade Comm'n*, 944 F.3d 901, 904, 910 (Fed. Cir. 2019) (construing "wall console"

as also "including a passive infrared detector," despite "passive infrared detector" not appearing

in the claims, where the court found disavowal of "wall consoles lacking a passive infrared detector").  Indeed, defendant Schwab itself proposes a definition of this very claim term that also uses the term "common identifier."  Finally, defendants argue that the disclaimer should not be included in every claim because it is already present in some of the claims.  But the only thing defendants point to is the preambles of a few claims which defendants have already said are not limiting.  In any event, the fact that Textile added the disclaimer explicitly to the claims of its later patents does not mean that the disclaimer does not apply to all patents.

**D.    "secured resource"**

| Term | Textile's Construction | Schwab's Construction | Non-Schwab Defendants' Construction |
|------|------------------------|-----------------------|--------------------------------------|
| secured resource | *plain and ordinary meaning* | Restricted information or account of the authorized user to be accessed in the transaction and for which the authorized user controls access. | Restricted information, such as personal information, credit data, medical history, financial account information, and secured physical locations |

There is no need to construe this term.  The plain and ordinary meanings of "secured" and "resource" are easily understandable for a jury: the resource is secured.  The term is two common words used together.  As such, the meaning is easily ascertainable, and, absent disclaimer or disavowal, the term need not be provided a more limited meaning.  *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1329 (Fed. Cir. 2013) (when a claim term has an ascertainable ordinary meaning, "our cases do not support prescribing a more particularized meaning unless a narrower construction is required by the specification or prosecution history.")

If the Court were to adopt a construction for this term, it should reject two problems with those proposed by the defendants.  First, while Schwab's proposed construction has the virtue of including an "account" of an authorized user, the other defendants leave that part out.  Accounts

should be included because the patents-in-suit clearly contemplate a credit or debit account as being a secured resource that might be accessed by the service client.  *See, e.g.*, Ex. P1, 079 Patent at 1:16-18, 7:53-55, 10:17-18.  The second problem is with Schwab's proposal to require access to the secured resource to be controlled by the authorized user.  While of course the authorized user controls access to the secured resource in some sense (since he is the one who requests access to be provided to the service client), both the patents-in-suit and the claims talk about the service provider controlling access to the secured resource (which is why the request for access is made to the service provider).  So that aspect of Schwab's construction is unhelpful and potentially confusing.

### E.    "messaging gateway"

| Term | Textile's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| messaging gateway | *plain and ordinary meaning* | A device for use in transferring messages between a plurality of communications channels by converting messages between a plurality of message formats. |

A gateway does not inherently require "a plurality of communications channels" or "converting messages between a plurality of message formats."  The ***only*** extrinsic evidence for this term does not even mention "message formats" in its definition of gateway.  Ex. P10, Barron's at 202 ("a link between different computer networks.")  If the Court decides to construe this term, however, Textile would edit defendants' construction to read as follows: "A device or software for use in transferring messages between different computer networks."

Defendants rely solely on passages from the specification that state that the messaging gateway can use a plurality of message formats.  *See* Def. Open. CC Brief at 10.  But that only means that the messaging gateway is not limited to a particular message format.  Nothing about those statements means that the messaging gateway must be able to convert between different

formats.

Defendants also rely on a passage from the 079 IPR in which they say that Textile admitted that the messaging gateway must have the ability to convert between different message formats. *See id.* at 10-11. But in reality, Textile argued exactly the opposite. During the IPR, the petitioner—like defendants here—asserted that the messaging gateway must have the ability of "converting messages between a plurality of message formats." *See* Ex. 7 at 31-32 [IPR POPR]. Textile acknowledged that the messaging gateway could use a wide variety of messaging formats, but expressly argued that the petitioner's proposal that it be required to convert between message formats "reads into the term capabilities which are explicitly stated in the '079 to only be preferred, and not necessary." *Id.*

### F.   "authorized user"

| Term | Textile's Construction | Defendants' Construction |
|---|---|---|
| authorized user | *plain and ordinary meaning* | A person or entity who has the right to grant access to a specific secured resource |

Defendants blatantly seek to exclude a device or a computer from the scope of an "authorized user." Def. Open. CC Brief at 11. But the specifications of the patents-in-suit expressly state that "***in accordance with the present invention*** an end user 34 may comprise ***any person or machine*** requiring…access for the service client 33 to a secured resource[.]" *See* Ex. P1, 079 Patent at 7:14-20; *see also* 802 Patent at 7:17-21; 499 Patent at 16:1-5. Given this express statement, defendants' proposed construction cannot be correct. *See MyMail, Ltd. v. Yahoo! Inc.*, No. 2:16-cv-01000-JRG-RSP, 2017 WL 3978190 at *12 (E.D. Tex. September 9, 2017) (construing "user" as "person, group, or computer system" instead of Defendant's proposed "roaming ***person*** using a computer" where the specification stated that a user may be a person or a computer).

Defendants have three arguments why a "user" must be a person or entity.  First, defendants argue that the agreed construction of "string" (which requires symbols to be chosen from a set that can be perceived by an end user) implies that the end user cannot be a computer. Def. Open. CC Brief at 11.  But, because the definition of "string" refers to a user rather than to a person, that simply begs the question.  Moreover, the specification expressly states that it is *optional* for the "string" to be readable by a human end user:

> Although not strictly necessary for the conduct of the present invention, it will be desirable, in at least those implementations requiring human handling of an authentication credential, that the authentication credential comprise symbols that also may be perceived by a human end user 34.

079 Patent 15:36-41.

Second, defendants point to examples from the prosecution history where Textile referred to an authorized person being the user.  *Id*. at 12.  But all that shows is that the user *can* be a person, not that the user *must* be a person.

Third, defendants argue that statements that the user has the "right" to access a secured resource imply that the user must be a person because only people have "rights."  *Id*.  But that simply is not true.  In computer science contexts, it is perfectly natural to speak about computers being granted rights or permissions to access various resources.  *See, e.g.,* Ex. P11 at ¶¶ 18, 20 [Chau] (describing the "access rights" of "user 105" which may be an individual or "software/hardware").  Defendants' conclusory assertion to the contrary certainly cannot trump the fact that the patent specifications expressly state that the user can be a machine or a person, a fact that defendants simply ignore.

G.     "key string"

| Term | Textile's Construction | Schwab's Construction | Non-Schwab Defendants' Construction |
|---|---|---|---|
| key string | an ordered sequence of any subset of symbols selected from a set of symbols wherein each symbol forming the set may be represented in both a format that may be perceived by an end user and a format that may be recognized by software or hardware<br><br>*The claimed system/method must operate in a manner so that the "key string" does not reveal a common identifier of the secured resource to the unauthorized service client.* | A one-time transaction specific ordered sequence of any subset of symbols selected from a set of symbols wherein each symbol forming the set may be represented in both a format that may be perceived by the requestor purporting to be an authorized user and a format that may be recognized by software or hardware, that cannot be known to or accessed by the service client, and that does not reveal a common identifier of the secured resource or any other information that would allow the unauthorized service client to gain access to the secured resource without again obtaining authorization from the authorized user. | A transaction specific ordered sequence, that may only be used for a single transaction, of any subset of symbols selected from a set of symbols, wherein each symbol forming the set may be represented in both a format that may be perceived by an end user and a format that may be recognized by software or hardware, and where the sequence is known to the authorized user and the secured resource provider |

The patent specifications each include the following express definition of "string":

It is now noted that as used herein a "string" shall for purposes of the present invention be expressly defined to mean "an ordered sequence of any subset of symbols selected from a set of symbols wherein each symbol forming the set may be represented in both a format that may be perceived by an end user 34 and a format that may be recognized by software or hardware," e.g., the set of all alphabetic and numeric characters in the English language.

079 Patent at 15:29-36.

This express definition is exactly what Textile has proposed for its construction (plus the disclaimer, about which more below).  Because Mr. Nandakumar chose to be his own lexicographer, this definition governs.  *See, e.g., Martek Biosciences Corp. v. Nutrinova, Inc.,*

579 F.3d 1363, 1380 (Fed. Cir. 2009) ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls.").

A "key" string is simply a string that acts as a key—*i.e.,* that provides access to some secured thing.  No further construction of "key" is necessary.

The disclaimer included in Textile's proposed construction comes directly from the PTAB's final decisions on the IPR of the 079 Patent, in which the PTAB expressly ruled on the scope of the disclaimer:

> [B]ased on the disclaimer explained above, we agree with Patent Owner and Mr. Oglesby that ***the claimed system and method must operate in a manner so that the 'key string' does not reveal a common identifier of the secured resource to the unauthorized service client***.

*See* Ex. P12, IPR Rehearing at 5 (quoting Ex. P6, IPR FWD at 19-20) (emphasis added).  This disclaimer is consistent with the specification disclaimers, which repeatedly stated that the system must work such that the common identifier is never exposed to the service client.  Ex. P1, 079 Patent 8:4-10; Ex. P2, 802 Patent 8:4-10; Ex. P3, 499 Patent 51:18-25.

Defendants' proposed constructions do not respect the express definition set forth in the specifications of Textile's patents or the actual disclaimer from the IPR history.  None of the changes or additions in their proposed constructions is warranted:

***Perceived by the Requestor***.  The express definition of "string" specifies that each symbol forming the set may be represented in a format that "may be perceived by an end user." Defendant Schwab proposes changing "end user" in this definition to "the requestor purporting to be an authorized user." because that is, for some unstated reason, "more precise."  Def. Open. CC Brief at 21-22.  There is no basis for making that change to the express definition that Mr. Nandakumar chose and included in his patent specifications.

***Known to the authorized user and the secured resource***.  Defendants (except Schwab)

argue that the "key string" must be known to the end user and the secured resource provider because "[t]he claims . . . all clearly require the 'key string' be 'known' to both the end user and the service provider." Def. Open. CC Brief at 15.  As an initial matter, that claims separately recite that the key string must be known to certain entities is strong evidence that "key string" does *not* itself include that requirement.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms. . . . To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.'").  Defendants' argument also fails because its premise is false:  only some of the claims that recite a "key string" require it to be known to the end user and the secured resource.  Compare, *e.g.,* claim 11 of the 079 Patent to claim 11 of the 802 Patent.  That only some claims separately recite this additional limitation is strong evidence that it should not be read into every claim that recites a "key string."

   ***Cannot be known to or accessed by the service client***.  Defendant Schwab's construction prohibits the key string from being known to or accessed by the service client.  The other defendants argue the opposite:  they argue that the key string ***must*** be provided to the service client (although they do not include that proposed requirement in their proposed construction).  Def. Open. CC Brief at 18.  All defendants are wrong.  What Mr. Nandakumar said in his patent specifications, and the disclaimer that was made during the IPR, was that the system must ensure that the common identifier is never exposed to the service client.  Textile acknowledges that a consequence of the disclaimer is that a key string that contains the common identifier cannot be sent to the service client.  Conversely, a key string that is sent to the service client cannot include the common identifier.  But nothing about the term "key string" or the disclaimer means that

every key string (including those without identifying information) must not be sent to the service

client.  Nor does anything about "key string" or the disclaimer mean that every key string

(including those that are never sent to the service client) must not include a common identifier.

Schwab's argument is based on a misreading of the IPR history.  It is true that, for claims

of the 079 Patent, the PTAB found that the key string cannot be shared with the service client.

*See* Def. Open. CC Brief at 22-23.  But the PTAB never said that this was a requirement of the

term "key string" in general.  Quite the contrary:  the PTAB expressly explained that this was a

requirement of the disclaimer being applied in the context of other limitations of the claims of

the 079 Patent that the PTAB found required the key string to contain identifying information.

Applying the disclaimer to that specific circumstance, the PTAB determined that the key string

of the claims of the 079 Patent could not be shared with the service client:

> Additionally, we stated how that construction of "key string" needed to be applied
> ***in the context of all the limitations of the server limitation (claim 1) and the
> determining step (claim 11):***
>
>> Stated differently, because the key string is adapted to provide a
>> basis for authenticating the identity of the requester and providing
>> access to the shared resource, the disclaimer acts to exclude
>> systems and methods in which the key string, ***with its identifying
>> information,*** is provided to the unauthorized service client.

Ex. 14 at 4 [Rehearing Decision].  Indeed, the petitioner in that IPR specifically argued in a

petition for rehearing that the PTAB erred by construing "key string" to "exclude systems and

methods **in which the key string**, with its identifying information, **is provided to the**

**unauthorized service client**."  *Id*. at 5 (emphasis in original).  But the PTAB explained that that

language was merely a "description of the claim" of the 079 Patent as a whole, and that it was

not part of its construction of the term "key string."  *Id*. at 5.  And in doing so, the PTAB again

emphasized that it was applying other limitations of the claims of the 079 Patent:

> Like Patent Owner's proposed construction, our construction and application
> prohibits revealing information from which unauthorized access to or control over
> the resource may be gained. . . . Because the "key string" recited in the claim is
> used to authenticate the requester, possession of the "key string" allows the holder
> to access or control the secured resource. ***The explanatory sentence following***
> ***the claim construction merely applies the construction to the entirety of the***
> ***limitation***.

*Id.* at 6-7.

Defendant Schwab admits that during the IPR the PTAB determined that the "key string"

of the 079 Patent claims "is itself 'a common identifier of the secured resource.'"  Def. Open. CC

Brief at 19.  Schwab argues that this determination was a mistake.  *See id*.  But mistake or not,

that determination—and not something about the disclaimer more generally—was the only

reason why the PTAB determined that the disclaimer required that the key string recited by the

079 Patent claims not be sent to the service client.  That determination simply does not apply to

other claims of other patents in which the key string is part of an authentication credential that

the claims expressly prohibits from including the common identifier.

The Court should reject Schwab's proposal that every "key string" in every claim of

every patent be construed so that it cannot be shared with the service client.  Not only is that

unrequired by the disclaimer, but it also makes no sense in the context of the other claims.  For

example, claim 1 of the 454 Patent recites an "authentication credential" that "comprises a key

string" but that "does not include or reveal the common identifier."  Sending that key string to

the service client would not run afoul of the disclaimer because it does not include the common

identifier.

***Transaction Specific***. Defendants assert that the claimed "key string" must be something

that is used only a single time, for a specific transaction.   But that cannot be right for multiple

reasons.

First, as discussed above, the PTAB itself recognized that the "key string" of certain claims can include a common identifier, such as a credit-card number, which is not transaction specific information.  Indeed, it is precisely because the PTAB determined that the "key string" of the claims of the 079 Patent included identifying information that it ruled that the key string of those claims could not be sent to the service client.

Second, as defendants themselves acknowledge, some claims expressly require the overall system or method to be transaction specific, while some claims do not.  Def. Open. CC Brief at 15.  The fact that this limitation appears in some of the claims, but not others, is strong evidence that not every claim—and certainly not every "key string"—is required to be transaction specific.

Third, the parts of the specification on which defendants rely either do not address the issue at all, or, when they do, make clear that being transaction specific is optional.  For example, defendants say that the specification states that the key string must be "for a particular transaction."  *Id*. (quoting the 079 Patent at 5:40-45).   But that part of the specification is plainly discussing information that is sent from the service client to user so that the user can formulate a request for access on behalf of the service client.  It has nothing to do with the formulation or transmission of a key string.  Similarly, defendants rely on portions of the specification that speak about the dynamic generation of certain information on a "transaction-by-transaction basis."  *Id*. (quoting the 079 Patent at 11:4-6).  But that portion of the specification speaks about generating information that identifies the service client—it has nothing to do with the generation of a key string.  Moreover, even if it were talking about key strings, it would not support defendants because it makes clear that such dynamic generation is not required in all cases.  *See id.* ("[I]n most cases . . .").

Fourth, defendants' reliance on Mr. Nandakumar's disclaimer, *see* Def. Open. CC Brief at 14-15, does not work because, again, a key string is not necessarily sent to the service client. And if it is not sent to the service client, then there is no need for it to be transaction specific (or to exclude the common identifier).  In support of this argument, defendants rely on teachings from the specification about whether an authentication credential (which may comprise a key string) can be sent to the service client multiple times.  *Id*.  But, again, not every key string of every claim is an authentication credential that is sent to the service client.  Accordingly, there is no basis to require every "key string" of every claim to be transaction specific.

**H.      "key string known to both said secured resource and the authorized user" / "key string known to both said server and an authorized user"**

| Term | Textile's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| key string known to both said secured resource and the authorized user / key string known to both said server and an authorized user | *plain and ordinary meaning* | Indefinite |

Defendants say this claim phrase is indefinite because "secured resources" and "servers" are inanimate things that are "incapable of knowing anything."  Def. Open CC Brief at 23.

The Court should reject this argument because the patents-in-suit are clear that the various entities set forth in the claims (the users, the service clients, the secured resources) can be implemented in computer hardware and/or software, and because it makes perfect sense to talk about computer systems "knowing" certain information.  Indeed, the express definition of "key string" set forth in the patent specification makes clear must be selected from symbols that may be represented in "a format that may be recognized by software or hardware."

As the intrinsic evidence makes clear, people of skill in the art are perfectly comfortable speaking about computer systems knowing and recognizing information.   For example, the 079

specification describes the number of accounts a user has as information that "***will become known to the request handler 51***," which the patents describe as server components.  Ex. P1, 079 Patent at 13:61-67.  The 499 specification refers to "***information generally known*** only to the end user 34 and ***the authenticator 52***."  Ex. P3, 499 Patent at 14:65-15:1.  Other art before the Patent Office during prosecution also refers to information being "known" to inanimate objects.  *See, e.g.*, Ex. P13, Chyanam (of record in 079 prosecution) at ¶ [0037] ("storing all valid user online IDs ***known to the authentication server***"); Ex. P14, Bishop (of record in 499 prosecution) at ¶ [0042] (information "already ***known by the digital wallet***"); Ex. P15, Hammad, (of record in 499 prosecution) at ¶ [0061] (information is "***known to*** both ***token 40*** and validation entity 80"); Ex. P16, Davis (of record in 499 prosecution) at ¶ [0089] (an identifier is "***known to the payment server***").  Defendants' position—that only humans can "know" anything—would require the Court to accept that all of these skilled artisans were talking gibberish when they referred to information being "known" to computer systems.

I.    **"key string [being] adapted to provide a basis for authenticating the identity of said requester"**

| Term | Textile's Construction | Defendants' Construction |
|---|---|---|
| key string [being] adapted to provide a basis for authenticating the identity of said requester | *plain and ordinary meaning* | Indefinite |

Defendants do not contend that the term "key string" is indefinite.  Nor do they contend that there is any uncertainty about what it means to "provide a basis for authenticating the identity of said requestor."  Rather, they contend that Textile's patents are invalid because the term "adapted to"—a term that is in common use in patent claims—is indefinite.  Def. Open. CC Brief at 24.

Defendants first argue that the term "adapted" has many possible meanings, including

"made to," "designed to," "configured to," "capable of," or "suitable for." *Id.* But even if there was any merit to that objection in general, it does not apply in this case because Textile's patent specifications provides an express definition of "adapted":

> Finally, to the extent that any structural (including software) element is stated as being adapted to perform some function, such language is to be taken as a positive structural limitation imposed upon the reference element whereby the element is required to be actually adapted, programmed, configured or otherwise provided with actual capability for performing the specified function.

This express definition of "adapted" may be broad in that it is met so long as the recited element is provided with the actual capability of performing the specified function, but its breadth does not mean that it is indefinite. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017); *CA*, 2021 WL 5323413 at *26 ("merely claiming broadly does not prevent the public from understanding the scope of the patent").

Defendants also argue that the term "adapted to" is indefinite because the patent specification does not explain "how" the key string is adapted to provide the required capability. But Textile's claims were not required to explain "how" a key string could be adapted to perform the required function in the claims themselves. Whether the specification provides a sufficient disclosure of how that can be done is a section 112 enablement or written description question. But nothing about that question bears on whether the term "adapted to" is a term whose meaning is understandable.

Defendants' own cases go against them. In *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010), the district court's construction of a term required it to be "adapted to" perform a function. The Federal Circuit affirmed that construction over the accused infringer's objection that the term "adapted to" in the construction rendered it indefinite. Defendants have not identified a single case finding the term "adapted to" to be indefinite,

whereas many find it to be definite.  *See, e.g., Central Admixture Pharm. Servs., Inc. v. Advanced Cardiac Solutions*, 482 F.3d 1347, 1356 (Fed. Cir. 2006) (holding that "adapted to" was not indefinite).

### J.    "authentication credential"

| Term | Textile's Construction | Schwab's Construction | Non-Schwab Defendants' Construction |
|------|------------------------|-----------------------|-------------------------------------|
| authentication credential | *plain and ordinary meaning* | A credential comprising at least the key string for authenticating an end-user's identity to authorize access to a secured resource by a service client. | The key string used for verifying the identity of the requester or the validity of a request for access |

Instead of construing "authentication credential," Schwab basically repeats the only two words in the term ("credential" and "authentication") while at the same time adding ***seventeen*** more words.  Schwab uses those seventeen words to import incorrect limitations such as: (1) requiring that the credential "compris[es] at least the key string," and (2) requiring that authenticating is done "to authorize access to a secured resource by a service client."[1]  The non-Schwab defendants repeat Schwab's mistake of requiring that the authentication credential be a key string, but otherwise offer a reasonable construction.  If the term must be construed, Textile would agree to the following revised construction: "The credential for verifying the identity of the requester or the validity of a request for access."

First, defendants incorrectly contend that "authentication credential" is "a term coined by the inventor" and that, as a result, the term "cannot be construed broader than the disclosure in

---

[1] The language "to authorize access to a secured resource by a service client" added by Schwab, Def. Open. CC Brief at 27, is implicit in the overall claim language, as the authentication credential is validated in furtherance of a request for access (or payment) on behalf of the service client.  As such, there is no need to add such language here.  Nor is that language required to be added.  Schwab's cited IPR language, Ex. P9, IPR POR at 45, 50, is not definitional or a clear and unmistakable disavowal of claim scope.

the specification."  Def. Open. CC Brief at 26 (citing *Indacon*, 824 F.3d at 1357 (Fed. Cir. 2016). The only support defendants offer for the notion that the term is "coined," however, is defendants' assertion that "[t]he record is devoid of any suggestion that 'authentication credential' has any known and established meaning in the art."  *Id.*

But the intrinsic record shows that "authentication credential" was indeed an understood term in the art.  Mizrah, of record during the 079 and 802 prosecutions, describes "establishing *an authentication credential*…."  Ex. P17, Mizrah ¶ [0029].  Pratt, also of record during the 079 and 802 prosecutions, refers to "the *authentication credentials* used in a previous user login." Ex. P18, Pratt ¶ [0084].  Chau, of record during the 499 prosecution, refers to software that will "receive *authentication credentials*[.]"  Ex. P11, Chau ¶ [0029].  None of Mizrah, Pratt, or Chau felt any need to explain what an "authentication credential" was before using the term. [2]  As such, the term was not "coined" by the inventor of the asserted patents.

Second, the claim language does not require an authentication credential to be or comprise a key string.  We know this because the claims specifically call out when an authentication credential *is also* a key string.  *See, e.g.*, 659 Patent claims 1 and 9 (reciting "whereby the first transaction specific authentication credential comprises a key string…") and 454 Patent claims 1 and 8 (same).  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.")

The other three patents use "authentication credential" and "key string" as parts of

---

[2] Defendants knock Textile's reliance on dictionaries from 1992 and 1996, but those dictionaries show that "credential" is well-understood even by people not in the art.  *See* Ex. P19, Am. Her. (defining credential as "[t]hat which entitles one to confidence, credit or authority"); Ex. P20, Websters Encyc. (defining credential as "anything that provides the basis for confidence, belief, credit, etc.")

separate elements in the same claims, indicating a different intended meaning. *See, e.g.*, 079 Patent claim 1 ("determine a key string" and "receive an authentication credential"); 802 Patent claim 1; 499 Patent claims 1 and 3. Indeed, the Patent Office stated that "[t]he claims recite both a 'key string' and an 'authentication credential' and no limitation recited in the [079 Patent] claims requires that they must be—or even can be—the same thing." Ex. P6, IPR FWD at 18.

Defendants try to sidestep this claim language by offering incorrect reasons to import limitations from the specifications. First, defendants cite disclosure in the specifications referring to authentication credentials as key strings. But even if every single embodiment refers to an authentication credential as a key string, without disclaimer, disavowal, or lexicography, it is not proper to so limit the claims. *Phillips*, 415 F.3d at 1323 ("we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"). Second, defendants cite language stating that, in an embodiment, the "authentication credential simply comprises a previously established key string," arguing that use of "simply comprises" necessarily requires that an authentication credential be a key string. Def. Open. CC Brief at 25-26 (citing *Karr v. Botkins Grain & Feed Co.*, 329 F. Supp. 411, 416 (S.D. Ohio 1970) ("when 'comprising' is combined with the word 'only' … the obvious conclusion is that it serves to restrict the inclusion of parts…to the [listed parts].")) But the court in *Karr* was construing **claim language** that included the words "…comprising…only." 329 F. Supp. at 416. Here, no such claim language exists, and the "simply comprising" language is not lexicography, disclaimer, or disavowal.

### K. "based upon passage of time"

| Term | Textile's Construction | Defendants' Construction |
|---|---|---|
| based upon passage of time | *plain and ordinary meaning* | Indefinite |

This claim language is simple to understand: it requires that the claimed authentication

credential have the feature that it will expire (*i.e.*, be invalidated based upon passage of time) instead of not having a time restriction.  There is nothing subjective about that requirement: either an authentication credential (1) may expire based on a time restriction, in which case it would meet the limitation, or (2) does not have a time restriction, in which case it would not meet the limitation.  The claims may be broad, but "breadth is not indefiniteness."  *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017); *CA*, 2021 WL 5323413 at *26 ("merely claiming broadly does not prevent the public from understanding the scope of the patent").

Defendants incorrectly argue that this term is indefinite, saying that it has no boundaries other than "untethered subjective opinion" and that "the specifications fail to provide any guidance as to what could possibly qualify as the claimed 'passage of time.'"  Def. Open. CC Brief at 28.  The boundaries of this term, however, are not determined by ***how much*** time is encompassed in the "passage of time" but by whether or not the authentication credential may expire using ***any*** "passage of time" as a factor.  *See Signal IP v. American Honda Motor Co., Inc.*, LA-2:14-cv-02454, Dkt. 68, 2015 WL 5768344 at *30-32 (C.D. Cal. Apr. 17, 2015) ("for a time" not indefinite because "[t]here is no uncertainty…[:] [a]ny amount of time will satisfy the condition."); *CA, Inc. v. Netflix, Inc.*, No. 2:21-cv-00080-JRG-RSP, 2021 WL 5323413 at *25-26 (E.D. Tex. Nov. 16, 2021) ("first time period" and "second time period" not indefinite).

### L.      "a service user interface in communication with said server…"

| Term | Textile's Construction | Defendants' Construction |
|---|---|---|
| a service user interface in communication with said server… | *plain and ordinary meaning* | Indefinite |

This is not a case like *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) (finding claim indefinite for claiming both an apparatus and a method where it was

ambiguous when the claim would be infringed).  The Federal Circuit has made clear that patent

claims are allowed to describe the environment in which a claimed method is practiced.  *See,*

*e.g., Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed.

Cir. 2008) (method claim with detailed physical structure for "pipelined processor" was not

indefinite: "Direct infringement of claim 1 is clearly limited to practicing the claimed method in

a pipelined processor possessing the requisite structure.")  Here, there is also no ambiguity: the

method claims are infringed by practicing the claimed method in an environment including,

among other things, a service user interface in communication with a server.

Moreover, the Examiner himself, through an Examiner's Amendment, entered the

amendments that added the entire "service user interface" element specifically in order to place

the method claims of the 079 and 802 Patents in condition for allowance.  *See* Ex. P21, 079 NOA

at 3 ("Examiner and Attorney Paul discussed … amendments applied to claim 11 in order to

overcome rejections for claims 11-20.  Attorney Paul authorized an Examiner's Amendment to

provide the discussed amendments to claim 11."); Ex. P22, 802 NOA at 3 (same).  As such, there

is a presumption that the amendment did not make the claims indefinite:

> Actions by PTO examiners are entitled to appropriate deference as official
> agency actions, for the examiners are deemed to be experienced in the
> relevant technology as well as the statutory requirements for patentability:
> "We presume that an examiner would not introduce an indefinite term into
> a claim when he/she chooses to amend the claim for the very purpose of
> putting the application in a condition for allowance."

*Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 23 F.4th 1334, 1343 (Fed. Cir. 2022) (quoting

*Tinnus Enters., LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1020 (Fed. Cir. 2018).)  Patent

Office examiners are "assumed to have some expertise in interpreting the references and to be

familiar from their work with the level of skill in the art and whose duty it is to issue only valid

patents."  *Nature*, 23 F.4th at 1343 (quoting *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d

1299, 1304 (Fed. Cir. 2008)).

Defendants contend that Textile somehow admitted that these claims are invalid for indefiniteness as mixed method/apparatus claims by making an amendment during the prosecution of a different (and later) patent application.  But Textile's amendment during prosecution of the 499 Patent was made to overcome a number of stated rejections.  It does not mean that Textile somehow admitted that the examiner's mixed method-apparatus rejection was proper.  By so amending, Textile addressed all stated rejections in one response and obtained timely allowance of the patent claims.  In any event, defendants cannot meet their burden to show that the method claims of the 079 and 802 Patents are indefinite solely by pointing to an amendment during prosecution of the later-issued 499 Patent.  *See, e.g., Oyster Optics, LLC v. Coriant America Inc.*, No. 2:16-cv-01302-JRG, 2018 WL 7019353 at *3 (E.D. Tex. Mar. 2, 2018) (refusing to limit issued parent patents where patentee allegedly "acquiesce[d] in the examiner's rejection" through amendment of claims in a child application).

**M.    "primary identifier"**

| Term | Textile's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| primary identifier | the account number for a credit card or financial deposit account; the Social Security Number of a patient; the account number of an ATM card; or the like. | Indefinite |

This term is just like the term "common identifier," so Textile proposes the same construction as it does for that term.  Defendants concede that "common identifier" is definite.  Textile told the Patent Office that there was specification support for the newly-added term "primary identifier," pointing to the specification's use of the term common identifier:

Ex. A to Applicant's Reply to Office Action Dated Dec. 16, 2015

| Claim Limitation | Specification Support |
|---|---|
| wherein said key string and authentication credential do not reveal any primary identifier associated with said secured resource. | **Para. [0353]**<br><br>Because, in at least some implementations of the present invention, the common identifier for the resource will for security reasons not be allowed to be openly transmitted as part of submitted request, this step will in such implementations involve determining the identity of the resource from some element or combination of elements of information other than the common identifier for the resource.<br><br>**Para. [0360]**<br><br>In a critical aspect of the authentication system 5-30 and method 5-46 of the present invention, an additional security measure is implemented by requir- |
| | ing that the service client 5-33 be restricted from access to the common identifier for the secured resource, e. g. the account number for a credit card or financial deposit account; the Social Security Number of a patient; the account number of an ATM card; or the like. |

Ex. P23, 499 Resp. at Ex. A, pp. 1, 13-14.[3]  In the next office action, the examiner did not raise

any issue regarding the newly-added "primary identifier" limitation, but rejected ***other newly-***

***added claim elements*** under 112(a) and 112(b).  Ex. P24, 499 OA2 at 3-5.  After amendments

addressing those rejections, the claims were allowed.  The intrinsic record is thus clear: a

"primary identifier" is the same as the specification's "common identifier."[4]

But even if that file history is ignored, "primary" identifier is easily understandable: it is

the main identifier (such as Bob's credit card number) for a secured resource (Bob's credit card).

Defendants cite no cases finding terms including "primary" indefinite.  Indeed, cases

---

[3] Defendants ignore this file history, arguing that the claim language and specification do not "explain[] what a 'primary' identifier is[.]"  But the entire record must be considered in a definiteness analysis.  *See Nature*, 23 F.4th at 1340 ("Claim language, standing alone is not the correct standard of law, and is contrary to uniform precedent.  Patent claims are viewed and understood in light of the specification, the prosecution history, and other relevant evidence[.]")

[4] Defendants argue that because the term "primary identifier" is used in the claims of the 499 Patent and the term "common identifier" is used in the claims of the 454 Patent, the terms "presumptively have different scope."  But, "[e]ven if it might be poor drafting practice, any presumption that different terms have different meanings is not conclusive, and it is not unknown for different words to be used to express similar concepts."  *AGIS Software Dev. LLC v. Google LLC*, No. 2:19-cv-361-JRG, 2020 WL 7229753 at *8 (E.D. Tex. Dec. 8, 2020) ("[t]his is particularly true where, as here, the terms at issue appear in separate claims[.]")  Likewise, "[d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the [intrinsic record indicates] such a reading of the terms or phrases is proper."  *Id*.

often find that such terms are not indefinite. *See, e.g., Westinghouse Air Brake Techs. Corp. v. Siemens Mobility Inc.*, No. 17-1687-LPS, 2019 WL 330512 at *4 (D. Del. Jan. 25, 2019) (finding, *e.g.*, "primary safety device data" not indefinite). This is especially so where, as here, the defendant did not "provide[] any evidence, such as an expert declaration, to support a finding that a POSA would not understand the boundaries of the claim." *Id.*

Defendants' indefiniteness argument is also gutted by their failure to identify ***any evidence*** about how a POSA would understand this claim term. "[T]he burden [i]s on [defendants] to prove by clear and convincing evidence that a person of ordinary skill in the field of the invention" would not understand the claimed invention's scope. *Elcommerce.com, Inc. v. SAP AG*, 745 F.3d 490, 505–06 (Fed. Cir. 2014), vac. on other grounds, 564 F. App'x 599 (Fed. Cir. 2014). Defendants' arguments are not enough: "[a]ttorney argument is not evidence." *Id.* "[I]n the absence of evidence provided by technical experts," "there is a failure of proof." *Id.* (vacating indefiniteness ruling where defendant did not present evidence "regarding the knowledge of [POSAs]."); *Whirlpool Corp. v. Ozcan*, No. 2:15-cv-2103-JRG, 2016 U.S. Dist. LEXIS 179492, *11–*12 (E.D. Tex. Dec. 28, 2016) (defendant failed to meet indefiniteness burden when it "relie[d] entirely on attorney argument based on the patent's intrinsic evidence").

Defendants then present four questions that it contends are "unanswered" regarding "primary identifier" in support of its indefiniteness argument, Def. Open. CC Brief at 30-31, inviting clear error in the process. *See Nature*, 23 F.4th at 1340 (in analyzing indefiniteness, "[t]he district court applied an incorrect standard of 'unanswered questions' and a flawed analysis of validity").[5] Regardless, those questions regarding "primary identifier" are answered

---

[5] Defendants also argue that their "questions are especially important in the context of these asserted patents, which recite" a number of terms with the word "identifier." Def. Open. CC

by the intrinsic record's discussions regarding "common identifier."

**N.** **"receiving at a messaging gateway …"**

| Term | Textile's Construction | Schwab's Construction | Non-Schwab Defendants' Construction |
|---|---|---|---|
| receiving at a messaging gateway … | *plain and ordinary meaning* | | Indefinite |

A subset of defendants argue that this term is indefinite because it does not specify what must be received.  Def. Open. CC Brief at 31-32.  There are two problems with this argument.  First, the claim is clear about what is received, since the receiving step must be performed by a messaging gateway having a set of instructions "operable to receive a request for transaction specific access to a secured resource by a serviced client."  499 Patent, Claim 1.  Second, if it really were true that it was "unknowable" what is required to be received, that would only mean that the claim limitation was broad and that it could be satisfied by performing any receiving step.  Nothing about that breadth would make the claim indefinite.

Defendants' argument is also inconsistent with other positions they have taken on claim construction.  For example, defendants contend that "in Claim 1 of the '499 Patent, step (a) must be performed before steps (b) and (c)[.]"  Def. Open. CC Brief at 4.  But step (a) is the "receiving…" element that defendants argue does not specify what is received.  *See* Ex. 20.  If the "request for transaction specific access" were not being received in step (a), as defendants contend here, there would be no reason for defendants to require it to be performed prior to step (c).

The file history of the 499 Patent is also fatal to defendants' indefiniteness position.  The

---

Brief at 30.  But a list of ***other*** "identifier" terms from ***other*** asserted patents (such as "merchant identifier") has nothing to do with whether "primary identifier" in the 499 Patent is definite.

examiner rejected the pending claims for statutory double patenting as claiming the same invention as the independent method claims of the 079 and 802 Patents.  Ex. P26, 499 OA1 at 4. The applicant amended the claims, retaining the same structure from the 079 and 802 Patents for the "receiving…" element, and stated that the amendment overcame the double patenting rejection by "directing the claim to a method of authorizing 'transaction specific access' to a secured resource and the flow of 'transaction specific information' *contained within the request*."  Ex. P23, 499 FH, 06/15/2016 Resp. at 2, 4, 8.  As such, it is plain that the "request" in the "receiving…" limitation is what is being received.  In the next office action, the examiner did not raise a single issue regarding the "receiving…" limitation, but rejected *other elements* of the pending claims under 112(a) and 112(b).  Ex. P24, 499 OA2 at 3-5.

### O.     "common identifier"

| Term | Textile's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| common identifier | the account number for a credit card or financial deposit account; the Social Security Number of a patient; the account number of an ATM card; or the like. | Identifying information for a particular secured resource (*e.g.*, a credit card number, social security number, ATM account number, etc.) |

The good news regarding this term is that the parties all agree on some specific things that are common identifiers: the account number for a credit card (*e.g.* Bob's credit card number that he uses to pay for his meal at the restaurant) or financial deposit account, the Social Security Number of a patient, the account number of an ATM card, or the like.  The only remaining dispute is whether it is necessary to begin the construction with a generic statement categorizing these examples.  Textile does not believe that it is necessary to do so, but would not object to an accurate statement, *i.e.*, to modifying its construction to read "information for a secured resource that is protected from the service client (*e.g.*, the account number for a credit card or financial deposit account; the Social Security Number of a patient; the account number of an ATM card;

or the like)." This makes clear that the examples of a common identifier are not just any information, but information protected from the service client.

Defendants' proposed statement characterizing the agreed upon examples is overbroad. Defendants say that any "identifying information" qualifies as a common identifier, but that is inconsistent with an important goal of the patents:  to keep valuable information such as a credit card number out of harm's way.  For example, a token that replaces a credit card number could arguably be considered identifying information because a bank would use the token to determine which credit card account to charge.  To argue that the token (which replaces a credit card number and is given to the service client) could qualify as a common identifier would thwart the entire point of the inventions.  Indeed, even defendants' citations show that the common identifier must also be something that needs to be withheld from the service client to help prevent fraudulent uses.  *See, e.g.*, 454 Patent at 48:25-30 ("the common identifier … will for security reasons be hidden from the service client").

## IV.    CONCLUSION

For the foregoing reasons, the Court should reject defendants' proposed constructions and adopt those proposed by Textile.

Dated: July 5, 2022                          Respectfully submitted,

*/s/ Matthew J. Antonelli*
Matthew J. Antonelli
Texas Bar No. 24068432
matt@ahtlawfirm.com
Zachariah S. Harrington
Texas Bar No. 24057886
zac@ahtlawfirm.com
Larry D. Thompson, Jr.
Texas Bar No. 24051428
larry@ahtlawfirm.com
Christopher Ryan Pinckney
Texas Bar No. 24067819

ryan@ahtlawfirm.com
ANTONELLI, HARRINGTON
& THOMPSON LLP
4306 Yoakum Blvd., Ste. 450
Houston, TX 77006
(713) 581-3000

Stafford Davis
State Bar No. 24054605
sdavis@stafforddavisfirm.com
Catherine Bartles
Texas Bar No. 24104849
cbartles@stafforddavisfirm.com
THE STAFFORD DAVIS FIRM, PC
815 South Broadway Avenue
Tyler, Texas 75701
(903) 593-7000

*Attorneys for Textile Computer Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically in compliance with

Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to

electronic service on July 5, 2022.

*/s/ Matthew J. Antonelli*
Matthew J. Antonelli