# EXHIBIT 9

Kevin Jakel  Confidential
October 15, 2019                                    1

Page 1

```
     CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
1    UNITED STATES PATENT AND TRADEMARK OFFICE

2     BEFORE THE PATENT TRIAL AND APPEAL BOARD

3   UNITED PATENT, INC.,      *

4           Petitioner,       *  CASE NO.:

5   vs.                       *  IPR2019-00482

6   AMERICAN PATENTS, LLC,    *  U.S. PATENT NO.:

7           Patent Owner.     *  7,373,655

8   *   *   *   *   *   *   *

9                     CONFIDENTIAL

10             SUBJECT TO PROTECTIVE ORDER

11  DEPOSITION OF:

12                     KEVIN JAKEL,

13  was held on Tuesday, October 15, 2019,

14  commencing 9:36 a.m., at Haynes & Boone, 800

15  17th Street, N.W., Washington, D.C., before

16  Mary Grace Castleberry, RPR.

17                      *    *    *

18
               U.S. LEGAL SUPPORT
19        1818 Market Street, Suite 240
             Philadelphia, PA  19103
20           Main:  877-479-2484
             Fax:  877-876-9330
21    Email:  SchedulingNE@uslegalsupport.com
```

Unified Patents Exhibit 1053

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 1 of 209

Kevin Jakel  Confidential
October 15, 2019                                      2

Page 2

```
 1   APPEARANCES:

 2

 3   On behalf of the PETITIONER:

 4     ASHRAF FAWZY, ESQ.
       UNIFIED PATENTS
 5     1875 Connecticut Avenue, N.W.
       Floor 10
 6     Washington, D.C.  20009
       (650) 999-0889
 7     E-mail:  Afawzy@unitedpatent.com

 8

 9   On behalf of the PATENT OWNER:

10     ZACHARIAH HARRINGTON, ESQ.
       ANTONELLI, HARRINGTON & THOMPSON
11     5306 Yoakum Boulevard
       Suite 450
12     Houston, Texas  77006
       (713) 581-3000
13     E-mail:  Zac@ahtlawfirm.com

14

15                    -oOo-

16

17

18

19

20

21
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 2 of 209

Kevin Jakel   Confidential
October 15, 2019                                3

1                   I-N-D-E-X

2          Deposition of Kevin Jakel

3               October 15, 2019

4

5   EXAMINATION BY:                    PAGE:

6   Mr. Harrington                      4

7   Mr. Fawzy                         187

8

9   EXHIBITS MARKED:                   PAGE:

10  1 - Order                           5

11  2 - August 23, 2019 email from Bajaj    5
        Raghav to Zac Harrington
12
    3 - October 7, 2019 email from Bajaj    5
13      Raghav to counsel

14  4 - Unified Patents press release     177
        dated September 18, 2019
15

16

17      (Exhibits included with transcript.)

18

19

20                  -oOo-

21

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 3 of 209

Page 4

```
 1                P-R-O-C-E-E-D-I-N-G-S

 2   WHEREUPON --

 3                    KEVIN JAKEL,

 4   a Witness called for examination by counsel

 5   for the Patent Owner, having been first duly

 6   sworn, was examined and testified as

 7   follows:

 8                    EXAMINATION

 9                BY MR. HARRINGTON:

10       Q.    Could you please state your full

11   name for the record?

12       A.    Kevin William Jakel.

13       Q.    And where do you work?

14       A.    I work at Unified Patents.

15       Q.    What is your position at Unified

16   Patents?

17       A.    I am the CEO.

18       Q.    Is there any reason why you can't

19   fully and truthfully testify here today?

20       A.    No.

21       Q.    You've had your deposition taken
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 4 of 209

Kevin Jakel  Confidential
October 15, 2019                                    5

Page 5

1    before, correct?

2         A.    I have.

3         Q.    About how many times?

4         A.    I am starting to lose count a

5    little bit.  Eight to 10, somewhere in that

6    ballpark.

7         Q.    So I'm not going to go over the

8    procedure too much, but your attorney may

9    object from time to time.  Unless he

10   instructs you not to answer, you should

11   answer my question.

12              Do you understand that?

13        A.    I do.

14        Q.    I would like to start out with

15   three exhibits.  Exhibit 1 will be the order

16   from the Board.  Exhibit 2 will be an email

17   from your attorney and Exhibit 3 will be an

18   email with documents attached.

19              (Exhibit Nos. 1 through 3 were

20   marked for identification.)

21              BY MR. HARRINGTON:

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 5 of 209

Kevin Jakel  Confidential
October 15, 2019
6

Page 6

1     Q.     Do you recognize these documents?

2     A.     I recognize the order.

3     Q.     Okay.

4     A.     I have never seen this email.  At

5  least I don't think I have.

6     Q.     Okay.  Let's go to Exhibit 3,

7  which is the email with documents.

8     A.     Okay.

9     Q.     Do you recognize these documents?

10     A.     Looks like this is a membership

11  agreement between Unified and Samsung.  What

12  is labeled as UP0017 looks to be a mass

13  email that we sent out related to the fact

14  that we had filed an IPR against American

15  Patents.  And it looks like there's UP0017

16  again.  And there's UP0021.  It looks like

17  another email, a mass email has gone out

18  saying that American Patents -- their patent

19  is determined to be likely invalid.  That's

20  probably when institution took place.  And

21  it looks like another version of the same

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 6 of 209

Page 7

```
 1    document.  And that looks to be everything

 2    that I see.

 3         Q.    Okay.  How did Unified go about

 4    collecting these documents?

 5         A.    Well -- so the membership

 6    agreement we pulled from our server as a

 7    copy of this membership agreement.  In

 8    addition to doing a bunch of discovery

 9    review on my part, we had -- these documents

10    were the emails that we had sent out that

11    were specifically related to American

12    Patents and so we produced those documents.

13         Q.    Did you do like a search through

14    emails or how did you search for those

15    documents?

16         A.    So these documents show up in my

17    email.  So when these documents go out, I

18    see these emails as well and so then I

19    believe -- my recollection is I instructed

20    these documents to be pulled from the system

21    that generates these emails.
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 7 of 209

Kevin Jakel  Confidential
October 15, 2019                                    8

Page 8

1        Q.     And what system generates those

2    emails?

3        A.     One is a mass email system that I

4    think comes out of Salesforce and the other

5    is a mass email system that comes out of --

6    I think it's called Mailchimp.

7               Basically give them a bunch of

8    email addresses and write the email blast

9    you want to send and then you hit send and

10   it sends the email to everyone that's -- all

11   the emails that you gave the system.

12       Q.     Exhibit 3, the cover email,

13   says -- if you look down to the third

14   paragraph -- says, "No responsive documents

15   were found for category 2"?

16       A.     Yes, I see that.

17       Q.     How did Unified determine that

18   there were no responsive documents for

19   category 2?

20               MR. FAWZY:  Objection to the

21   form.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 8 of 209

Kevin Jakel  Confidential
October 15, 2019                                    9

Page 9

1                THE WITNESS:  So let's make sure

2      that we are talking about the right thing.

3      So category 2 is referring to what, given

4      that I've never seen this email before?

5                BY MR. HARRINGTON:

6           Q.    So category 2 is, when you go to

7      Exhibit 1, the first full page, and there's

8      a number 2.

9           A.    Yes.

10          Q.    So do you recognize that category

11     2?

12          A.    I do.

13          Q.    Do you believe that that category

14     2 that your attorney is referring to in the

15     email is the same category 2 that the court

16     order here is -- well, the PTAB order is

17     referring to?

18          A.    I believe that to be accurate,

19     yes.

20          Q.    So how did Unified determine that

21     there were no written communications between

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 9 of 209

Page 10

1    Unified and Samsung that identify a patent

2    or types of patents to be considered for an

3    IPR petition or express Samsung's requests,

4    instructions, preferences, suggestions or

5    desires for selection of a patent or types

6    of patents for filing an IPR review?

7         A.    We determined that because I did

8    a personal review of all of the

9    communications between Unified and Samsung.

10   And in my review of all of the

11   communications between us and Samsung, for

12   any custodian that I believed could have

13   even communicated with Samsung, I found no

14   communications at all that identified

15   patents or types of patents to be considered

16   for an inter partes review or express -- or

17   I guess express at member's requests,

18   instructions, preferences, suggestions, or

19   desires regarding the selection of patents

20   or types of patents for filing an inter

21   partes review.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 10 of 209

1                    So I went into every email

2    account, every custodian that would have

3    been in a position to communicate with

4    Samsung.  I limited the search in the email

5    to every email that we would have received

6    from Samsung as well as every email that we

7    would have sent to Samsung by using their

8    email address as the search term.

9                    And so I basically was able to

10   look at every single email that would have

11   gone either from us to them or from them to

12   us, and then I reviewed every single one of

13   them and found that there were no

14   communications at all that met category 2.

15        Q.    So you said you looked at every

16   custodian.  How many custodians were there?

17        A.    Off the top of my head, I don't

18   know the exact number.  I don't recall the

19   number.

20        Q.    Is there sort of a main person at

21   Unified that communicates with Samsung?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 11 of 209

```
 1        A.    Mostly -- I mean, myself is one

 2   of the main persons who communicates with

 3   them.  Shawn Ambwani does as well for

 4   purposes of we're the people who actually go

 5   to Korea.  So a lot of the communications

 6   are just about scheduling, timing of when

 7   we're going to be in Korea and visit with

 8   them when we're there.

 9             And then those -- I mean, that

10   was the vast, vast majority of all of the

11   communications was between myself and

12   Samsung and Shawn Ambwani and Samsung.

13        Q.    So you went through basically all

14   of the email communications between Unified

15   and Samsung.  Is there any other kind of

16   communications between Samsung and Unified?

17        A.    I mean, there are phone calls, so

18   scheduling phone calls and things like this.

19   So obviously we do talk on the phone.  But

20   other than that, there are none.

21        Q.    Samsung and Unified don't fax
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 12 of 209

Page 13

1    back and forth between each other or send

2    letters, formal letters, anything like that?

3         A.    No.  I can't remember the last

4    time I used a fax machine.

5         Q.    Just gotta check.

6         A.    Yeah, no.  I getcha.

7         Q.    So you said you went through all

8    of the emails.  About how many emails were

9    there between Samsung and the custodians at

10   Unified?

11        A.    There were, for kind of both

12   Shawn and I, there were like over 100.  I

13   would think probably less than 200.

14        Q.    So earlier you called the emails

15   in Exhibit 3 mass communications.  It looks

16   like for each of these emails, there's a

17   list attached to it with a bunch of email

18   addresses.  Is that all of the email

19   addresses that these communications went to?

20             I'm not familiar with the system

21   so I'm just trying to figure out what these

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 13 of 209

1   emails mean.  So, for example, if you go to

2   UP0017, there's a little email description,

3   Unified filed an IPR, and then there's a

4   list of emails below that saying date sent,

5   date opened, last opened.

6        A.    Yes.

7        Q.    Is that all of the people that

8   have received this email that you're aware

9   of?

10       A.    So there are, I guess, two types

11   of mass emails that we typically send out.

12   This one appears to be the -- so we send out

13   like a -- every time we do something, we

14   send out an email.  This one goes to the

15   list of members, so this is like the member

16   mass email.  So this goes to everyone who, I

17   guess, is a member of Unified.

18            We've asked them who do you want

19   to get our, like, mass emails.  They said,

20   we would be interested.  So sometimes

21   there's more than one person.  Sometimes

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 14 of 209

1    there's only one.  But this would be kind of

2    just be -- this is like a -- we just send

3    this out like after every single thing that

4    happens.  Every IPR that's filed, one of

5    these is generated and it's sent out to

6    everyone at Unified.

7        Q.    And it's just a list of all the

8    people that are Unified members?  Or not --

9    sorry.  Strike that.

10            Are there any people on this list

11   that get the email that are not Unified

12   members?

13       A.    This particular one is Unified

14   members.  I could go through the list to see

15   if every single email address is related to

16   a member or not.  I probably would be able

17   to do that off the top of my head.  This

18   looks to be the list of members.

19       Q.    Okay.  Are there any members, as

20   far as you're aware -- and you don't have

21   to -- if you don't know this, you can tell

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 15 of 209

1   me you don't know -- but are there any

2   members that do not get this email list?

3   For example, is there certain members that

4   say, I don't want your mass email?

5        A.    It's possible.  I think you can

6   ask to be removed from it and, you know,

7   when people change positions within the

8   company or things like that, I think that

9   there have been changes that have been made

10  to who is kind of responsible for the

11  Unified kind of relationship within the

12  company.

13            So I am certain that this email

14  distribution list has changed over time, but

15  this is like marketing material.  We just --

16  we send this out just to tout the fact that

17  we filed -- we send this type of email out

18  to everyone regardless of what zone they're

19  in.  It's just like a mass email to

20  everyone.

21        Q.    Okay.  How many employees does

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 16 of 209

Kevin Jakel  Confidential
October 15, 2019                    17

1    Unified currently have?

2        A.    I believe we have now reached 17,

3    I believe is the total.

4        Q.    Can you tell me what your then

5    employees do?

6        A.    Sure.  So we have a legal

7    department that includes myself, Shawn

8    Ambwani, Jonathan Stroud, Ash, Roshan,

9    Alyssa, Jessica, Joane, David, Michelle and

10   one more, I believe.  And they are

11   responsible for overseeing and drafting IPRs

12   and then prosecuting them after the fact.

13           They're responsible for prior art

14   review.  They're responsible for reviewing

15   landscape information and a whole bunch of

16   stuff that kind of legal departments do for

17   us.  They work on patent equality issues and

18   writing stuff for all kinds of things.  So

19   that's kind of the legal department at the

20   company.

21           We have a kind of data division

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 17 of 209

Page 18

1    that is responsible for all the tools you'll

2    find on our website, all of the databases

3    that we maintain.  They're responsible for,

4    I guess, like kind of all the analytics and

5    the litigation data and all the things that

6    we kind of collect and provide as tools on

7    our website.  They also are responsible for

8    kind of the essential patent databases and

9    all the stuff that's kind of related to

10   that.

11             We also do a whole bunch of --

12   kind of, I guess, litigation analytics and

13   produce kind of a -- I think it's a

14   quarterly MPE litigation report that goes

15   out and says everything that's kind of going

16   on in the universe.  They kind of handle all

17   of that.

18             And then in addition to that, we

19   have two software developers who are

20   responsible for developing software tools

21   and maintaining our software platform and

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 18 of 209

Page 19

1    all the stuff that we do on that front, so

2    they're -- but they're basically just

3    software developers.

4         Q.    Okay.  So the legal department,

5    was there eight people; is that right?

6         A.    Somewhere in that ballpark.

7    Eight, nine.  I need to look specifically to

8    remember exactly.

9         Q.    And then in the software

10   developers, there were two.  So there was

11   somewhere between -- taking me a minute to

12   do this -- between six and seven people in

13   the data department; is that correct?

14        A.    I don't know.  Maybe.  I need

15   to -- I'm going to have to like look this

16   up.

17        Q.    Okay.  Rough numbers are fine.

18        A.    Yeah.  I mean, we also have like

19   a client development woman as well who like

20   helps organize like membership and also

21   organizes phone calls and marketing calls

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 19 of 209

1   and all that kind of stuff.

2           She also helps to put together

3   all of our conferences and things throughout

4   the year and all that kind of thing.

5       Q.    I don't want to get into any

6   particular detail, but can you tell me what

7   the overall salary expenses are that Unified

8   has today?

9       A.    I believe it's like ███████████

10  █████████.  ██████████████████████ is my

11  off-the-top-of-my-head ballpark for expenses

12  on the salary side.

13      Q.    Do you know what percentage of

14  that is the legal department?

15      A.    Not off the top of my head.

16      Q.    Aside from salary, what other

17  expenses does Unified have?

18      A.    Rent, travel, you know, all the

19  kind of business development expenses,

20  conference expenses.  We do, you know, the

21  prior art searching expenses.  We have legal

Page 21

1    expenses for both our own kind of legal

2    stuff as well as obviously filing IPRs.  I

3    don't know.  I haven't -- that's a decent

4    summary.

5         Q.    The legal expenses, and you said

6    for IPRs, is that outside counsel expense

7    you're referring to?

8         A.    Yes.  And we -- it's not just

9    outside counsel.  It's experts in prior art

10   and all the -- everything that kind of goes

11   into the cost of running an IPR.

12        Q.    How big is that expense on a

13   yearly basis for Unified?

14        A.    I believe for the last year, it

15   was about ████████████ in annual expense.

16        Q.    Do you know what percentage that

17   is of Unified's expenses?

18        A.    Just that outside counsel expense

19   is ████████████████ of the like

20   accrued revenue for the year.

21        Q.    ████████████████? When

Page 22

```
 1    you said just outside expense, you mean

 2    outside counsel and experts, right?  That

 3    was the kind of overall bucket you're

 4    referring to?

 5         A.    Yeah.  Not including the legal

 6    expense internal to the company to run all

 7    of this.

 8         Q.    Yeah.  So just for outside

 9    counsel and for experts and kind of running

10    the IPRs, that cost is ██████████████████

11    ████████████?

12         A.    Somewhere in the ballpark.

13         Q.    Does outside counsel do any of

14    the work pre-filing an IPR; for example,

15    investigating potential IPRs that Unified

16    may file?

17         A.    No.

18         Q.    So the decision, kind of the

19    investigation -- well, strike that.

20               The investigation into which IPRs

21    to file, that's all done by Unified
```

1    in-house?

2         A.    Well, it's a little more

3    complicated than that.  I mean, I guess when

4    we decide to start looking at a patent and

5    we decide that that patent's going to be

6    handled by a law firm if we file, then we

7    would engage an outside counsel to start the

8    work on it.

9              Sometimes we would have already

10   started looking at prior art.  Sometimes we

11   might not have started looking at prior art

12   at all.  But, I mean, the decision to

13   ultimately file depends on whether or not we

14   actually have prior art and we like the

15   arguments and, you know, it's a good filing.

16             So it depends on what you mean by

17   preparation.  Like the decision to hire a

18   counsel to start working on a patent is

19   handled completely internal to Unified.  If

20   we decide that we believe that by filing an

21   IPR, we create a deterrence value for our

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 23 of 209

Page 24

```
 1   zone and we say we're looking at -- we need

 2   to start working on this, that part is, at a

 3   minimum, handled completely internal to

 4   Unified.

 5        Q.    Has Unified ever decided -- made

 6   the decision it was going to file an IPR and

 7   then had a law firm turn it down and say,

 8   no, we can't file that for you?

 9              MR. FAWZY:  I'm going to object

10   and -- just on the basis of privilege and

11   caution the witness not to reveal any

12   privileged information.  So I don't know if

13   you can answer that question without

14   revealing privileged information, but you

15   can try.

16              THE WITNESS:  So let me just say

17   that have we ever looked at a patent -- I

18   mean, it's not so much that they are telling

19   us whether or not they can or can't do it,

20   but it is the case that we will look at

21   patents and find that the prior art, despite
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 24 of 209

1   our best efforts at searching, would show

2   that if we were to file an IPR, we wouldn't

3   be successful, I guess is one way to talk

4   about it.

5            I don't know exactly the scope of

6   what you mean they tell us that they can't

7   do it.  But if we were to engage with a firm

8   and both through our own internal legal

9   counsel and reviewing the legal work that a

10  firm did, we as a team would decide that the

11  prior art wouldn't show that that IPR would

12  be successful, if we didn't like the

13  arguments, then we very well would walk away

14  from filing an IPR.

15           BY MR. HARRINGTON:

16      Q.   Has that ever actually happened?

17      A.   I mean, I don't know if we really

18  think this is privileged or not.  I mean, I

19  don't --

20           MR. HARRINGTON:  If you guys want

21  to discuss it and think about it --

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 25 of 209

Page 26

1                     MR. FAWZY:  Yeah.  I'm going to

2      instruct him not to answer the question --

3                     MR. HARRINGTON:  Okay.

4                     MR. FAWZY:  -- on the basis of

5      privilege.

6                     BY MR. HARRINGTON:

7         Q.    How does Unified determine which

8      law firm it's going to use for a particular

9      IPR?

10                    MR. FAWZY:  Also, I'm going to

11     instruct -- object on the basis of privilege

12     and instruct you not to answer to the extent

13     it reveals privileged information, but if

14     you can answer generally.

15                    BY MR. HARRINGTON:

16        Q.    I can ask a more specific

17     question.  Does Unified take any outside

18     input into its decision as to what law firms

19     to hire?

20        A.    Absolutely not.

21        Q.    Has any Unified member ever made

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 26 of 209

Page 27

1    suggestions about what law firms it prefers

2    Unified to use for any IPRs?

3          A.     No, not in the sense that they

4    are telling us -- one of the things that

5    Unified actually does is -- I don't know if

6    you've looked at our portal, but we actually

7    keep statistics on every single IPR that

8    gets filed and every law firm that handles

9    one.

10                So we have statistics on what law

11   firms have done well and which ones have

12   done bad.  This is something we do generate

13   and publish and our members have asked us,

14   like, hey, what do you think about law firms

15   and who's done well and we talk about our

16   statistics and we talk about whatever.  But

17   we have not been the recipient of anyone

18   saying, hey, you need to use this particular

19   law firm.  I don't think I've ever had that

20   conversation with a member.

21         Q.    Is Apple a member?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 27 of 209

Page 28

1          A.      Apple is a member, yes.

2          Q.      Are you aware that Apple has a

3     preferred vendor list for law firms that

4     it's willing to use?

5          A.      I'm not familiar with it.  It

6     does not surprise me.  I've been in-house

7     counsel at a firm -- sorry, at a company and

8     I have my own preferred list of counsel.  It

9     doesn't surprise me that they have it.  I

10    have never heard of Apple's preferred vendor

11    list.

12         Q.      Has any of the members, of

13    Unified's members, ever shared its preferred

14    vendor list with Unified --

15         A.      Not to my knowledge.

16         Q.      -- for its law firms?

17         A.      Not to my knowledge.

18                 MR. FAWZY:  I'm going to just

19    take a second.  So far we've gone over

20    inferring that includes Unified confidential

21    information.  So I'm just going to ask that

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 28 of 209

Kevin Jakel   Confidential
October 15, 2019                                    29

Page 29

1    we put this transcript on the -- designate

2    it as confidential under the protective

3    order in this case.

4             BY MR. HARRINGTON:

5        Q.    Where does Unified maintain

6    offices?

7        A.    We have an office in California,

8    in San Jose.  We have an office in

9    Washington, D.C. and then we have a lot of

10   folks who work from home, so, I mean,

11   they're not necessarily maintaining an

12   official Unified office, but they have a

13   home office or they -- yeah, I think that --

14   everyone who works remotely works from a

15   home office right now.

16       Q.    Where does Unified get its

17   revenue?

18       A.    So we have subscriptions that we

19   sell to what we call our NPE zones and we

20   also have an SEP zone, a standard essential

21   patent zone.  Both of those members would

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 29 of 209

Page 30

1    subscribe to those zones and would pay us to

2    subscribe to those zones.  That is where

3    revenue comes from from that area.

4              We also have conferences that we

5    host throughout the year.  And those

6    conferences we sell kind of sponsorships to

7    law firms and we generate some revenue from

8    those sponsorships.  We also do some kind of

9    what we call patent quality drive work where

10   companies pay us to look at and analyze kind

11   of NPE and patent matters, things around

12   like litigation and NPE activity to generate

13   data that can be used.

14              Those would be, I think, off the

15   top of my head, the sources of revenue right

16   now.

17       Q.    Can you give me rough percentages

18   for each of those revenue streams?

19       A.    The revenue from the conferences

20   is ███████████████████████████████

21   ██████████████      The patent quality drive

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 30 of 209

1    stuff I mentioned is ███████████████████.

2    ████████████████████████████████.

3              And then the revenue generated

4    from the NPE zones and the SEP zones is

5    probably █████████████████████████████

6    ███████████████████████████████████████

7    █████████████████████████████████

8    ███████████

9         Q.    So for Samsung, we have an

10   agreement here for Samsung.  Is this for the

11   ███████████████████████ agreement?

12        A.    It is not.  Samsung only is

13   participating in the content zone in the NPE

14   zones.

15        Q.    So Samsung -- there's the SEP and

16   NPE and ████████████████████████████████

17   ███████████; is that correct?

18        A.    Yes.  There are some five or six

19   zones or so, I guess, in the NPE zones and

20   Samsung participates in the content zone.

21        Q.    Okay.  The SEP zone, so that

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 31 of 209

1    would be for stuff like when you have like

2    the Velos Media case?  Is that like one of

3    the SEP zones?

4        A.    We have filed IPRs in the video

5    codec zone and Velos Media is one of the

6    companies that we filed IPRs against.

7        Q.    And so that's part of the SEP --

8        A.    That's part of SEP.

9        Q.    -- part that you talk about?

10       A.    Yes.

11       Q.    So as part of the SEP business, I

12   guess it sounds like it's kind of a separate

13   business; is that correct?

14       A.    I mean, I guess, you know, it's

15   like a separate product, I guess, yeah.  We

16   do different things in the SEP zones than we

17   do in the NPE zones.  In both of them, we do

18   file IPRs.  But there's a lot of data and

19   tools we've developed on standard essential

20   patent licensing to help companies provide

21   kind of FRAND offers if they're approached

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 32 of 209

Page 33

1    and we have a bunch of data that we've

2    generated in those SEP zones that members in

3    those SEP zones get access to that other

4    members in non-SEP zones don't get.

5         Q.    So how does Unified decide, for

6    the SEP cases, how does it decide which

7    portfolios to file IPRs on?

8              MR. FAWZY:  Objection to scope.

9              THE WITNESS:  So --

10             BY MR. HARRINGTON:

11        Q.    I'm getting somewhere.

12        A.    Unified -- internal to Unified,

13   we have reviewed everyone's -- you know,

14   what we believe are all the patents that are

15   being used in this case in the video codec

16   area and we decide which entity we choose to

17   file IPRs against.

18        Q.    So in the HEVC area, there's

19   multiple portfolios, correct?

20        A.    There are.

21        Q.    And is one of the portfolios a

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 33 of 209

Kevin Jakel  Confidential
October 15, 2019                              34

Page 34

1    portfolio which Samsung owns a large portion

2    of?

3        A.    I believe Samsung does own the

4    portfolio on HEVC.

5        Q.    How did you determine that you

6    were going to go against the Velos Media

7    HEVC portfolio versus going against the

8    Samsung HEVC portfolio?

9            MR. FAWZY:  I'm going to just

10   object as to scope and relevance and then

11   also caution the witness not to reveal the

12   substance of any privileged communications.

13           THE WITNESS:  So the way we've

14   handled these questions in the past, because

15   a lot of privileged information goes into

16   deciding which patents to file against and

17   which ones to not.  A lot of legal analysis

18   goes into the whole process of figuring out

19   which patent and how to go after it.

20           So the way we have always handled

21   this is to be able to say kind of in the

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 34 of 209

Kevin Jakel   Confidential
October 15, 2019                                     35

Page 35

1    abstract, like what do we look for in terms

2    of figuring out how Unified decides which

3    IPRs are going to generate a deterrence

4    value and, you know, give you some guidance

5    about what Unified looks to in the abstract.

6    But having a specific conversation about a

7    specific entity and a specific patent

8    involves a bunch of kind of privileged

9    information that we don't waive privilege

10   on.

11            So I can talk to you about our

12   process for evaluating this, but we're not

13   going to answer specific questions that

14   would waive privilege about our analysis on

15   any individual patent and any individual

16   entity.

17        Q.   Does Unified have a policy

18   against filing -- well, strike that.

19            Has Unified ever filed an IPR

20   against any of -- any patent that's owned by

21   one of its members?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 35 of 209

Kevin Jakel   Confidential
October 15, 2019                                        36

Page 36

1          A.     The truth is that I don't know.

2    There are a lot of ownership questions, who

3    owns what patents and what type of back-end

4    agreement companies have between the patents

5    that were perhaps originally owned by

6    members who then transferred to others.

7                So I don't know if members have

8    ever had an ownership stake in a patent or a

9    back-end monetization agreement with

10   members.  We don't -- we do not have a

11   policy of not filing against members, but at

12   the same time like our NPE zones are

13   described to deter NPE activity and so, you

14   know, by the very nature of what we do,

15   it's -- I don't see a whole lot of NPEs

16   joining Unified.  They can.  But if they

17   did, we would use their revenue to go out

18   and generate deterrence against the use of

19   bad patents in our zones.  So that's the --

20   you know, it doesn't make a whole lot of

21   sense for NPEs to join Unified.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 36 of 209

Kevin Jakel   Confidential
October 15, 2019                                    37

Page 37

1        Q.    I guess it all depends on how you

2    define NPEs.  I think many people consider

3    many of your members to be NPEs.  But I

4    would like to know if you're aware of

5    Unified filing an IPR against any patent

6    that was owned wholly by one of its members.

7              MR. FAWZY:  Objection.  Calls for

8    speculation.

9              THE WITNESS:  So I don't know of

10   any IPR we have filed where the patent that

11   we filed on was wholly owned by any of our

12   members.

13             BY MR. HARRINGTON:

14       Q.    Are you aware of any patent that

15   was partially owned by one of your members

16   that you ended up finding out was, after you

17   filed the IPR, was partially owned by one of

18   your members?

19       A.    We have never, after we filed,

20   no.  It's possible.  That was my point

21   earlier.  It's possible, but we don't know.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 37 of 209

1    We don't ever really get any information

2    about who owns what kind of behind the

3    scenes of any type of NPE activity.

4         Q.    So as far as you're aware,

5    there's not been an IPR file by Unified

6    against any of its members?

7         A.    I guess -- this is kind of a

8    repeat of the last two questions, I guess.

9    Like certainly as far as I know, no member

10   has wholly owned a patent and we filed

11   against it, and that seems to be rather

12   obvious.

13              I don't think anyone really

14   thinks that any of our members are NPEs.

15   And as well, I guess I would repeat the fact

16   that I don't know if any member has owned a

17   portion of any of the NPE activity where we

18   have filed an IPR.

19        Q.    How do you define NPE?

20        A.    So it's a little bit squishy just

21   generally.  I mean, everyone has lots of

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 38 of 209

Page 39

1    different definitions.  The one that we tend

2    to use most often is to say that the company

3    generates more revenue from licensing and

4    litigation monetization of patents than they

5    do from the selling of products and

6    services.

7         Q.    Under that definition, do you

8    feel that Qualcomm would be an NPE?

9         A.    It's -- I mean, it's always

10   possible that under any definition, you

11   might find that, you know, someone meets the

12   definition of an NPE.  I don't generally

13   consider Qualcomm to be an NPE.

14             Another way that I often analyze

15   this issue is to see whether or not the

16   entity holding the patents can be kind of

17   countersued based on the products and

18   services they sell, right?  So it's another

19   way to kind of analyze it.

20             Qualcomm definitely doesn't fit

21   an NPE definition in that way because they

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 39 of 209

Kevin Jakel   Confidential
October 15, 2019                                    40

Page 40

1    do sell products and services and those

2    products and services could be, you know,

3    countersued based on patent infringement.

4              One of the advantages of an NPE

5    structure is that when you file litigation,

6    the NPE really doesn't have the same type of

7    vulnerability to a countersuit as most

8    operating companies.  So that's another kind

9    of definition/analysis that we might do to

10   look at whether or not that particular

11   entity might be an NPE, and Qualcomm would

12   clearly fail under that side of the

13   analysis.

14        Q.    So I guess one of the reasons you

15   guys are doing the standard essentials is

16   you consider standard essentials companies

17   to be NPEs.  So the HEVC company that is

18   owned by Samsung and other of its companies,

19   that would be considered an NPE?

20        A.    No.  That's why it's not an NPE

21   zone.  Standard essential patent zones, the

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 40 of 209

Page 41

1    IPRs we would file inside the scope of our

2    SEP zones, there is no -- there we're trying

3    to deter a different patent problem, I

4    guess.  We're not necessarily focused on

5    only trying to deter NPEs in our SEP zones.

6          Q.    Why are those companies not NPEs?

7    They can't be sued, right?  They're not

8    making anything, that's correct?

9          A.    I guess I'm not following your

10   question.

11         Q.    Well, you have a group of

12   companies that put together a patent pool

13   and they put that in a separate company.

14   That company then can't be countersued for

15   patent infringement, correct?

16         A.    Well, I guess you're going to

17   have to be a lot more specific about what

18   entity you're talking about.

19         Q.    I'm just trying to figure out you

20   guys' definition of NPE and what kind of

21   counts.  It seems like you have a little bit

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 41 of 209

Page 42

1   of a look and feel definition for NPE.  I'm

2   just trying to figure out what the

3   boundaries are.

4        A.    Okay.  Well, like I said, on the

5   NPE side of what we do, we are, in those

6   zones, trying to deter NPE activity from the

7   technology areas that we work in.  On the

8   SEP side, we are not focused on NPE problems

9   and so your question doesn't really make

10  sense to me.

11       Q.    Does Unified have a board of

12  directors?

13       A.    Right now, I am the only person

14  on our board.

15       Q.    Does Unified have any kind of

16  board of advisors?

17       A.    We do not.

18       Q.    Is Unified a for-profit company?

19       A.    We are.

20       Q.    Does Unified pay any companies

21  for services?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 42 of 209

                                                         Page 43

1          A.      You're going to have to be a lot

2    more specific.  Yes.  The answer is yes.

3          Q.      For example, it pays law firms

4    for services, correct?

5          A.      Correct.

6          Q.      And does Unified benefit from

7    those services?

8          A.      I don't know in this context what

9    you mean by benefit.

10         Q.      What is the purpose of Unified

11   hiring a company for services?

12         A.      I mean, we hire Paychex to do

13   payroll.  We hire all kinds of companies to

14   do all kinds of things for us.  So I'm happy

15   to answer all of them.  I just need a little

16   more specificity.

17         Q.      And so when you hire those

18   companies, when Unified hires those

19   companies, does it receive some benefit for

20   those services?

21                 MR. FAWZY:  Object to the form.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 43 of 209

Page 44

1                THE WITNESS:  I don't think --

2    and I would never have said those words,

3    that it's a benefit.

4                BY MR. HARRINGTON:

5        Q.    Is the issue with benefit?  What

6    do you receive for the services?

7        A.    I pay them and they do the work I

8    ask them to.  This is not a -- I don't know.

9    I don't use the word "benefit" to describe

10   how I hire companies for services.

11       Q.    Is there a better word you can

12   think of than benefit?

13       A.    I hire them to do a job and they

14   do the job that I need done.

15       Q.    Is that a net positive for

16   Unified?

17               MR. FAWZY:  Objection.

18               THE WITNESS:  Not if they don't

19   do it well.

20               MR. FAWZY:  Objection.  Form.

21   Object.  Asked and answered.  Vague.  Object

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 44 of 209

Kevin Jakel   Confidential
October 15, 2019                                    45

Page 45

1    to the form.

2                    BY MR. HARRINGTON:

3        Q.    Does Unified pay for any service

4    from which Unified does not benefit?

5                    MR. FAWZY:  Object to the form.

6    Vague.

7                    THE WITNESS:  I don't agree.  I

8    don't understand what you mean by benefit.

9    Do we benefit?  No.  We have a need for a

10   service.  We hire the firm to do the

11   service.  And if they do a good job, then

12   they've done their job well.  If they do it

13   poorly, then we would hire another company

14   to do that service.

15                   BY MR. HARRINGTON:

16       Q.    Are there any advantages to

17   Unified for hiring a law firm to file IPRs

18   for it?

19       A.    Are there any advantages to

20   hiring one firm over another?

21       Q.    Just any firm instead of just

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 45 of 209

Page 46

1    doing it itself.

2         A.    I'm not sure that we -- I'm not

3    sure there are advantages to hiring a law

4    firm.  They're more expensive than hiring

5    lawyers directly and having them in-house

6    and doing it.  So I'm not certain that in

7    all situations it's -- that's not the reason

8    why we hire law firms.  We hire law firms

9    because we have a need to do legal work and

10   so we find the firm that we think is going

11   to do the best job and we hire them.

12        Q.    Okay.  And wouldn't a benefit of

13   that be that Unified doesn't have to do

14   those tasks itself?

15        A.    Again, I'm not necessarily

16   certain that that's a benefit.  I could save

17   money by hiring the attorney myself and

18   doing it in-house.

19        Q.    Well, then why doesn't Unified do

20   that?

21             MR. FAWZY:  Objection.  Vague.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 46 of 209

Page 47

1    Relevance.   Speculation.   Improper

2    hypothetical.

3                    THE WITNESS:   We do do that some.

4                    BY MR. HARRINGTON:

5         Q.    So in the instances in which

6    Unified doesn't do that, doesn't do it

7    in-house, why doesn't Unified hire an

8    outside law firm?   Isn't it for some sort of

9    benefit?

10        A.    I guess I'm not understanding

11   what you mean by benefit in this context.

12   We have a job to do and we hire people to do

13   it.   So that is -- we try to hire the best

14   people for the job, but that's the

15   motivation behind it.

16                   It has a lot of -- it has

17   everything to do with budget and bandwidth

18   and the complexities of running a company

19   are significant.   So like each and every

20   decision we make is pretty multifaceted on

21   how we decide how and where to hire people

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 47 of 209

Page 48

1    for the work that we do.

2         Q.    What's your definition of

3    benefit?  Have you heard that word before?

4         A.    I have.

5         Q.    Use benefit in a sentence for me,

6    please.

7         A.    I benefit when my daughter does a

8    great job at school because it makes me

9    happy.

10        Q.    Does Unified provide a service?

11        A.    I believe that Unified does

12   provide a service.

13        Q.    What is that service?

14        A.    In our NPE zones, the service

15   that we provide is to go out and try and

16   deter NPE litigation from what we consider

17   to be key technology areas.

18        Q.    And how about the SEP zones?

19        A.    Kind of the same thing.  We --

20   but not focused on NPE activity.  We want to

21   deter the kind of unsubstantiated

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 48 of 209

Kevin Jakel  Confidential
October 15, 2019                                    49

Page 49

1    monetization of standard essential patent

2    areas -- or sorry, standard essential

3    patents on standard technology areas or

4    technology areas based on standards and we

5    provide a whole bunch of associated data to

6    help companies analyze the landscapes

7    surrounding standard essential patent areas.

8         Q.    Who benefits from Unified's HEVC

9    SEP IPR filings?

10        A.    We believe that the technology

11   area as a whole is what we're hoping to

12   benefit.  And we want everyone who is

13   possibly either currently using standards

14   related to video codecs or even companies

15   who are not, we want the whole kind of

16   technology area to benefit from the kind of

17   deterrence work we do inside the standard

18   essential patent zone.

19        Q.    Is there anyone in the technology

20   area for an SEP zone that doesn't benefit

21   from Unified's IPRs?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 49 of 209

Page 50

1                    MR. FAWZY:  Object to the form.

2                    THE WITNESS:  Is there anyone in

3      the video codec space that doesn't benefit?

4                    BY MR. HARRINGTON:

5         Q.    Yes.  You said you wanted

6      everyone in that technology area to benefit.

7      But are there certain people that wouldn't

8      benefit?  For example, I guess the members

9      of Velos Media don't benefit from those

10     IPRs.

11                   MR. FAWZY:  Object to the form.

12                   THE WITNESS:  I mean, I

13     personally don't know whether or not they

14     feel like they benefit or not.  That would

15     be something you would definitely want to

16     ask them and not me.

17                   I think the zone, the technology

18     area around the video codec and the

19     standards that are associated with it are

20     going to benefit from us going out and

21     deterring unsubstantiated use of bad patents

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 50 of 209

Kevin Jakel   Confidential
October 15, 2019                              51

Page 51

1    on standards, because I think that the

2    entire industry and HEVC and its adoption, I

3    think that everyone will benefit, even

4    patentholders, in the standard essential

5    patent zones we work in.

6                 Again, everyone benefits from the

7    technology area if we go out there and kind

8    of show, through data and IPRs, that that

9    zone is -- that there's a bunch of kind of

10   unsubstantiated use of bad patents in the

11   standard essential patent areas that we're

12   working in.

13                MR. FAWZY:  Anytime you feel like

14   taking a break --

15                MR. HARRINGTON:  That's fine.  We

16   can take a break.

17                (Brief Recess.)

18                BY MR. HARRINGTON:

19        Q.    So before we took a break, we

20   were talking about who benefits from the SEP

21   business.  Who benefits from Unified's NPE

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 51 of 209

1    business?

2        A.    So --

3              MR. FAWZY:  Objection.  Calls for

4    speculation and to the form of the question.

5              THE WITNESS:  So I would say that

6    we are -- Unified was intended to work kind

7    of like a trade association where a trade

8    association works on behalf of an industry

9    or technology where there are some companies

10   that will participate in the trade

11   association and some that will not, but

12   their like goal is to go out and basically

13   do something that benefits the industry or

14   the technology area.

15             Unified is the same -- like our

16   goal has always been to define technology

17   areas and then what we have told everyone is

18   you may or may not get anything that you

19   think is good for you, but what we are going

20   to go -- and our mission is to go out and

21   try to make technology areas something that

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 52 of 209

1   NPEs either don't have, that don't want to

2   come try and monetize in because they don't

3   have good patents or, if they do want to

4   monetize in these technology areas, that

5   they do the necessary upfront work to make

6   sure that they actually buy very

7   high-quality patents and, you know, can

8   monetize a patent that, you know, is

9   actually valid.

10          So the industry that we protect

11  is -- that that's who we are going to go out

12  there and work on behalf of is the zone.  So

13  we think that the zone as a whole is the --

14  is the -- really an entity, but like the

15  technology area is going to benefit from us

16  going to work as we do in these NPE zones.

17       Q.    So when Unified files an IPR and

18  it then settles with an NPE, ████████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████

21       A.    ██████████████████████████████

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 53 of 209



American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 54 of 209

Page 55

██████████████

████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████    The reason why we believed it

7    was ultimately a deterrent is because we

8    don't pay anything.  So we've never paid an

9    NPE any money to settle an IPR.  They've

10   never paid us money.  We've never paid them

11   money.  We basically say, okay, this is a

12   fully paid license, but there's going to be

13   no money changing hands.

14           As a litigator, I'm sure you have

15   probably participated in preparation of lots

16   of damages reports.  I did back in the day.

17   It basically -- it's a huge deterrent for a

18   patent owner to give Unified a license

19   that's free because it means if you wanted

20   to go out and try and create a damage expert

21   report that claimed this patent was wildly

Page 56

1    valuable, this would be a massive deterrent

2    to that kind of expert report being

3    generated.

4              And so Unified, on its own, kind

5    of decided that that would be kind of a

6    sufficient means of us generating a

7    deterrent against the particular patent,

8    particular entity that we were negotiating

9    with at the time and we developed a

10   structure in which no one knows anything.

11   It's just a completely confidential

12   negotiation between us and the patent

13   holder.  And if they choose to take that or

14   I guess give that free license, then that

15   gives us the ability to have created a

16   pretty significant deterrent against that

17   patent and for the zone.

18             And then the great thing for us

19   is that we then save money by not having to

20   fight that IPR all the way to the end and

21   then we have, you know, kind of free capital

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 56 of 209

1    to go to work on other patents.

2              So the settlement in the biggest

3    sense allows us to actually touch more

4    patents and create more deterrence for the

5    zone than it would be if we tried to or had

6    to fight every single IPR all the way to a

7    final written decision or an appeal.  So

8    that is the deterrence value that we believe

9    gets generated by a settlement activity.

10        Q.    So to be clear, when -- I guess

11   is it true, in all of the settlements that

12   Unified has done for IPRs it's filed, that

13   ██████████████████████████████████

14        ██████████████████████████

15        Q.    And no one's ever -- Unified's

16   never paid anyone for that license?  It's

17   just been a royalty-free license?

18        A.    We don't pay for the license.

19   Our members don't even know that the license

20   is happening.  So no one knows anything.  So

21   we are -- we're not in a position to pay

1    NPEs anything.  So we don't pay them.  They

2    don't pay us.  And in terms of -- yeah, so

3    that's the structure of the deal.



```
19        Q.    So I guess what -- like in

20    American Patents, I don't understand what

21    the deterrence effect would be of a license
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 59 of 209

Page 60

1    to ███████████████.   I think the only

2    Unified member in the American Patents was

3    Samsung, correct?

4         A.    It's my understanding that

5    Samsung is the only member that has

6    currently been sued.

7         Q.    And I think you guys have

8    answered interrogatories to that effect

9    saying Samsung was the only member.  So in

10   Unified or in this case, Samsung has already

11   taken a license.  It already paid for a

12   license to the patent that Unified has

13   IPR'd.

14              Do you understand that?

15              MR. FAWZY:  Objection.

16              THE WITNESS:  I don't know what

17   goes on behind the scenes.  So I don't know

18   that they've taken a license or not.

19              BY MR. HARRINGTON:

20        Q.    You know that they've been

21   dismissed, correct?

Kevin Jakel  Confidential
October 15, 2019                                61

Page 61

1        A.    I heard that there was a

2   dismissal.

3        Q.    And there was an announcement of

4   a settlement in the case.  It was publicly

5   announced?

6        A.    Understood.  But that doesn't --

7   I have not personally gone in and looked to

8   see if there's any indication that that

9   settlement was actually the result of a

10  license.

11       Q.    I'm telling you now that Samsung

12  has settled and taken a license.

13       A.    Sure.

14       Q.    And what I want to know is what

15  is the deterrent effect, if American Patents

16  settled with Unified, of Samsung getting

17  another license because that's the only

18  license that would be given, right?  It

19  would be Samsung would be getting a license?

20       A.    I guess I'm --

21            MR. FAWZY:  Objection.  Vague and

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 61 of 209

Kevin Jakel   Confidential
October 15, 2019                                    62

Page 62

1    improper hypothetical.

2              BY MR. HARRINGTON:

3         Q.    I'm trying to figure out what the

4    deterrence effect would be.

5         A.    So I will start and say that like

6    this IPR was never about Samsung and its

7    litigation with American Patents.  So the

8    idea of the IPR being related to whether or

9    not Samsung has a license or doesn't have a

10   license is basically irrelevant to us.

11             Our analysis is that this patent

12   fits into a number of our zones and we

13   determined by looking at it that we believe

14   there would be a deterrence value to Unified

15   to going after this and so we have done that

16   on behalf of the zones themselves.  This has

17   nothing to do with Samsung or whether or not

18   Samsung has settled or not.

19             So we do believe that the zones

20   that we have taken action on behalf of here,

21   if we were to get a zero dollar license to

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 62 of 209

Page 63

1   American Patents, that that would be -- that

2   would ultimately generate a deterrence value

3   for the zones we work in and it would be

4   something -- I mean, it's okay with us if we

5   don't settle.  Like we're not sitting here

6   talking about settlement with American

7   Patents.  I mean, if that's something that

8   you guys want to talk about, we could always

9   enter into an NDA and talk about it, but

10  that's not, as far as I know --

11        Q.    I'm just trying to figure out

12  your process.

13        A.    No, I understand.  I'm just

14  telling you I don't know whether the process

15  includes whether or not Samsung has taken

16  ███████████  or not.  What we work on behalf

17  of is the zones and settlement in our zones

18  also generates a deterrence effect and it

19  also helps us generate a bigger deterrent

20  effect by not spending money going all the

21  way the distance on every single patent.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 63 of 209

Kevin Jakel  Confidential
October 15, 2019                           64

Page 64

1                  But on some of them we save money

2    and that allows us to generate more

3    deterrence by filing more IPRs or doing

4    other work elsewhere.  So in our opinion, it

5    does generate a deterrence impact for the

6    zone when we settle.

7         Q.    So I guess the assumption you're

8    making for there being a deterrence is that

9    other members of your zone are practicing

10   the patents; is that correct?

11        A.    I have no idea if other members

12   in our zone are practicing patents.

13        Q.    Well, that's -- if they're not

14   practicing the patents, then what does it

15   matter?  That's like if I give a license to

16   you for a patent that you don't do, there's

17   no value in that to anyone.  That's just --

18   you're just like, hey -- it can't be used in

19   a damages model because in order for a

20   damages model to work, you have to say --

21   that person has to be in the same position

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 64 of 209

1    as the infringer.  And you're saying, hey, I

2    gave you a zero dollar license for somebody

3    who is not infringing.  That's not a

4    relevant license.

5         A.    My point is --

6         Q.    Is that correct?  Is that a

7    correct statement or do we have a different

8    understanding of kind of how the damages

9    process works?

10        A.    No, I agree with your -- that is

11   what a damage process looks like.  I'm

12   telling you I don't know whether or not any

13   of my members are actually practicing the

14   patent or could be accused of practicing the

15   patent.  Getting a zero dollar free license

16   to Unified ███████████, that is going to

17   ultimately result in a bunch of analysis.

18              I don't know whether or not the

19   specifics of any one company will ultimately

20   qualify as them practicing or not.  I

21   believe -- I mean, usually when an NPE

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 65 of 209

Page 66

```
1    patent is used, it tends to be on the broad

2    side and there tends to be lots of

3    defendants, the typical fact pattern.  I

4    don't know exactly how many defendants have

5    been sued here, but there were a lot.

6              So the fact that there's other

7    companies that might be out there doing the

8    same thing in a zone is possible.  I -- we

9    don't analyze it to figure out.  But what we

10   believe is that the grant of a license to

11   Unified is ultimately going to be the kind

12   of license that would play into a damages

13   analysis in the future and we think that

14   that actually does serve as a deterrent for

15   this patent and ultimately for others that

16   are watching.

17             I mean, this is -- when we talk

18   about deterrence, we're not talking about

19   just American Patents.  We're talking

20   about --

21        Q.   That's what I'm interested in.
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 66 of 209

Kevin Jakel   Confidential
October 15, 2019                                    67

Page 67

1          A.      Everyone -- every NPE that looks

2     at what we do for a zone, we would like them

3     to say, okay, if we're going to enter into,

4     you know, the transportation zone, right, we

5     better do so with a really good patent

6     because there's Unified out there and they

7     have basically put us on notice, right, that

8     bad patents are something that were, you

9     know, there to help make sure that they

10    don't use for monetization purposes.

11         Q.     So I'm still trying to figure out

12    kind of this model.  So Unified -- so let's

13    just take American Patents as an example.

14    Unified filed an IPR in one of the patents

15    in the portfolio.  That patent is now

16    expired.  If Unified and American Patents

17    had a settlement, which we're not interested

18    in doing, but if they had a settlement, that

19    settlement would -- I don't know how that --

20    what would the deterrence effect be for an

21    expired patent where there is a license of

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 67 of 209

1 ███████████████ Unified?  How is that

2 deterring anyone?  How is that deterring

3 American Patents?

4      A.    It might not deter American

5 Patents, but it might deter someone who is

6 watching American Patents --

7      Q.    Oh, okay.

8      A.    -- and decides, hey, if I'm going

9 to go buy another patent and try and

10 duplicate what American Patents is doing, I

11 don't want to -- you know, American Patents

12 look like they didn't -- they got

13 instituted.  It looks like their patent

14 wasn't as high a quality as they thought

15 originally.  Maybe they didn't put enough

16 work into it.  Maybe they didn't search long

17 enough and hard enough to find it.

18           I mean, the number of things that

19 I'm sure you're aware go into monetizing the

20 patent is huge, right?  It's a bunch of

21 things.  So we want everyone looking at the

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 68 of 209

Kevin Jakel  Confidential
October 15, 2019                                    69

Page 69

```
 1   zone, not just American Patents.  In fact,

 2   this has come up a lot.  Like, yeah, I mean,

 3   it sucks to get selected by Unified Patents

 4   because then we are, you know, getting new,

 5   but that's kind of lucky.  There's lots of

 6   other NPEs out there that we could have gone

 7   after as well.

 8            But this is -- we end up finding

 9   ourselves here now, but that's the -- this

10   is the process.  We don't want -- we want to

11   create a deterrence.  That deterrence is not

12   about American Patents and it's not about

13   our members and it's about, hey, we want to

14   show that bad patents should not be used in

15   the zone that we are protecting.

16        Q.    So the deterrence effect

17   basically is the kind of threat of IPRs and

18   anti kind of NPE cost of IPR litigation; is

19   that correct?

20        A.    I don't know if it's necessarily

21   the cost.  I mean, an IPR is somewhat
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 69 of 209

Page 70

1   expensive.  But compared to the cost of

2   litigation, it's not that expensive.  So

3   mostly what we want to show is that, you

4   know, unfortunately when you want to sue

5   lots and lots of companies, you tend to have

6   to go out and buy really, really broad

7   patents.

8              Really, really broad patents

9   often tend to also be associated with kind

10  of poor quality patents from a validity

11  perspective.  This is -- you know, law

12  students kind of learn this in patents 101,

13  right?  So this is something we believe that

14  by being able to show that super broad

15  patents being used against lots and lots of

16  companies tend to be invalid, that we will

17  then be -- by showing those are invalid and

18  being able to do it, the deterrence is that,

19  hey, you don't want to buy a patent, sue a

20  bunch of companies and then find out your

21  patent is invalid and not be able to

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 70 of 209

Page 71

1    monetize anything because your patent should

2    never have issued in the first place.

3              Rather, if you're going to go out

4    and buy a patent, then we would love to see

5    everyone do their homework, spend the

6    upfront money to actually do the work, to

7    find a high-quality patent and then if

8    you're going to come into the zone, that's

9    perfectly fine.  We're not saying there's

10   anything illegal or bad about monetization,

11   but monetizing bad, like kind of invalid

12   patents that should never have issued in the

13   first place we think is a huge drain on, you

14   know, the zones and the economy as a whole.

15   So if we're going to license patents, great,

16   but we should be licensing high-quality

17   valid patents.

18        Q.    What's the downside for Unified

19   filing IPRs?  What happens when Unified

20   loses IPRs?

21        A.    If we lose an IPR, it means that

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 71 of 209

Page 72

 1    the USPTO disagreed with our arguments.

 2        Q.    So there's no downside really?

 3    There's no kind of estoppel issues?  You

 4    guys have gotten around all of that?  It's

 5    kind of -- it's just a free shot at testing

 6    a patent's invalidity?

 7             MR. FAWZY:  Object to the form

 8    and calls for a legal conclusion.

 9             THE WITNESS:  Yeah.  I mean, I

10    wouldn't characterize our loss the way that

11    you did.

12             BY MR. HARRINGTON:

13        Q.    Is there any downside to Unified

14    or its members when it loses an IPR?

15             MR. FAWZY:  Objection.  Vague.

16             THE WITNESS:  I mean, by the way,

17    I would say if there's any downside that

18    would come from it, the way you're implying,

19    I think, it would not just apply to our

20    members as I've kind of talked about, like

21    this -- the reason we would have identified

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 72 of 209

Kevin Jakel  Confidential
October 15, 2019                              73

Page 73

1    a patent and believed it was invalid was

2    because we had looked at it and we had

3    decided we believed it was invalid and we

4    had also checked that patent and found that

5    it met the definition that we have for the

6    zone.

7                    And there are lots and lots of

8    companies that produce products that meet

9    the definition of our zone and some of those

10   companies are our members.  But in most

11   cases, there are lots and lots of companies

12   who are not our members.  So any downside

13   that could exist from us taking action on

14   the patent, we believe that downside is

15   something that all companies would be

16   affected by.

17                    BY MR. HARRINGTON:

18       Q.    Is there any downside when

19   Unified loses an IPR?

20       A.    Again, I don't really know.  This

21   is -- in my opinion, like if -- sometimes we

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 73 of 209

Page 74

```
 1   don't agree with the patent office, but

 2   usually we still believe very strongly in

 3   our arguments.  And so, I mean, there's --

 4   I'm not going to speculate as to what those

 5   downsides might be, but if there are

 6   downsides, those downsides would apply to

 7   the entire zone.

 8        Q.    In 2011, when they enacted the

 9   AIA which ended up creating IPRs, do you

10   think Congress intended for there to be any

11   downside to losing an IPR?

12              MR. FAWZY:  Objection.  Calls for

13   speculation.

14              THE WITNESS:  I guess I'm -- can

15   you point to something Congress said would

16   be the downside?

17              BY MR. HARRINGTON:

18        Q.    So there's estoppel provisions in

19   the IPR that said when you lose an IPR, you

20   no longer can -- the whole point of an IPR

21   is it's supposed to be an alternative to
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 74 of 209

Page 75

1    litigation.  So when you lose an IPR, you

2    can no longer contest it in a district

3    court.  That's a downside.

4               MR. FAWZY:  That wasn't a

5    question.  I'm sorry.  I have no objection.

6               THE WITNESS:  Yeah, I guess

7    I'm -- this is your definition of what you

8    believe a downside is.  I don't necessarily

9    agree or disagree.

10              BY MR. HARRINGTON:

11        Q.   Do you agree that there are

12   estoppel provisions that have been put in

13   the AIA for particular reasons?

14        A.   I believe that the -- I can say

15   as a fact there are estoppel provisions

16   built into the AIA.

17        Q.   And what were the purposes of

18   those estoppel provisions?

19              MR. FAWZY:  Objection.  Calls for

20   speculation.

21              THE WITNESS:  If we wanted to

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 75 of 209

Kevin Jakel  Confidential
October 15, 2019                                          76

Page 76

 1   review the congressional record to see if we

 2   could identify what the motivations for

 3   Congress were, we could try to figure that

 4   out.  But I'm not going to speculate as to

 5   the specific motivations for Congress.

 6              BY MR. HARRINGTON:

 7       Q.    If you go back to Exhibit 3.  On

 8   page UP0017, why does this press release

 9   mention TCL, LG, Samsung, Sharp, Acer and

10   Huawei?

11       A.    We typically give a little

12   summary of the litigation.

13       Q.    Is there a reason why Asus isn't

14   mentioned here?  Asus is also sued and is a

15   very similar company to Acer.

16       A.    Maybe we, at the time, thought it

17   was redundant to kind of include it if it

18   was so similar to Acer.  I don't know.

19       Q.    Is it your understanding these

20   companies might have a specific interest in

21   seeing this patent IPR'd?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 76 of 209

Kevin Jakel  Confidential
October 15, 2019                                    77

Page 77

1      A.    Can you say that again?

2      Q.    Why these particular companies

3   are listed here, and one guess I would have

4   is that Unified thinks that these particular

5   companies would be interested in the IPR.

6              For example, we know that Samsung

7   would be interested because Samsung is a

8   member.

9      A.    You're assuming that Samsung is

10  interested.  I have no idea if they are or

11  not.

12     Q.    Well, you sent it to Samsung,

13  correct?

14     A.    This went to our members, but we

15  did not include their name here because we

16  thought they were interested in it.

17     Q.    Why would you include the name

18  then?

19     A.    Because as I said in the

20  beginning, in all of our summaries of our

21  activities, we include a short description

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 77 of 209

Page 78

1    of the technology.  So we're only looking at

2    one out of hundreds of these things that get

3    sent out and like the description of all of

4    our other mass emails are identical.  We

5    always include a little summary along with

6    the companies that have been sued on the

7    patent.

8                And -- I mean, in this case, I

9    think it was probably a -- we grabbed some,

10   but not all because I think the list was

11   significantly longer than this.  And so the

12   choice of just including some provided the

13   purpose of summarizing the litigation, but

14   there's no indication of which companies

15   cared or didn't care about this IPR.

16   Because honestly, we don't know whether or

17   not they liked this IPR or hated it.  We

18   just simply don't know.

19                So in this list here, again, the

20   UP17 and the emails, it looks to me like

21   there are 38 Samsung.com addresses.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 78 of 209

Kevin Jakel  Confidential
October 15, 2019                                          79

Page 79

1              MR. FAWZY:  Which page?

2              MR. HARRINGTON:  So 17, 18 and

3    19.  This is on the list.  You're looking at

4    the redacted version.

5              MR. FAWZY:  Yeah, this is 18.

6              MR. HARRINGTON:  If you keep

7    going.

8              MR. FAWZY:  Oh, okay.

9              MR. HARRINGTON:  Sorry.  That's

10   how you guys gave it to us.

11             MR. FAWZY:  Yeah.

12             BY MR. HARRINGTON:

13       Q.   Why are there so many Samsung

14   addresses in this list here?

15       A.   My suspicion is that there are

16   this many Samsung addresses because when we

17   first -- this -- I'm 99 percent certain that

18   this email is sent from our Salesforce

19   system.  And so when we first like set up

20   our Salesforce system, we basically uploaded

21   all of our contacts into Salesforce.  This

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 79 of 209

Page 80

1    is kind of regardless of whether or not

2    we've talked to them specifically about

3    Unified or not.

4              This is just like all of our

5    contacts went into Salesforce.  And then

6    when this email goes out, it goes out to

7    anyone in the Salesforce system that has a

8    Samsung email address.  So this is not --

9    this is just everyone -- all of our contact

10   was put into Salesforce.  And then when we

11   send out our kind of marketing materials,

12   not just this one, but all of the other

13   ones, too, so every single mass email we

14   send out goes out identical to this.

15             There's nothing special about

16   this particular mass email related to

17   American Patents, but what has happened here

18   is that all of our emails -- and I think we

19   had -- Samsung being a pretty big

20   organization -- and I think what happened

21   here is lots of Samsung email addresses got

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 80 of 209

Page 81

1   sucked up into Salesforce, and now when we

2   send out an email like this, it sends it to

3   everyone who has a Samsung email address.

4        Q.    So you believe there's 38 people

5   at Samsung that Unified in some way has had

6   communications with aside from these mass

7   emails?

8        A.    That wouldn't surprise me.  It's

9   a massive organization and over the years,

10  we've met lots of people at Samsung.

11       Q.    When you say you've met lots of

12  people, does Samsung members come here

13  and -- Samsung employees come here and you

14  meet with them and talk to them about

15  various issues?  How does that happen?

16       A.    I guess I'm saying that this list

17  of emails isn't even just Unified-related

18  stuff.  This goes back to -- from the

19  beginning of our personal careers.

20            When I say we uploaded our

21  personal contacts, I'm saying like

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 81 of 209

Page 82

```
 1    everyone's -- like everyone's email contacts

 2    at the company are sucked up through an

 3    automatic email sucking-up system.  Sorry.

 4    This is --

 5         Q.    That's all right.

 6         A.    But Shawn's great with these type

 7    of like tools, right?  So he goes and he

 8    finds a tool that's going to scoop

 9    everyone's email contacts up for the

10    company, scoops it all up.  So if anyone

11    even on day one for Unified had a Samsung

12    email in their addresses from a previous

13    life, those email addresses would have been

14    captured and all of this would have been

15    uploaded into Salesforce and then Salesforce

16    would have had a universe of everyone's

17    email.

18              And so this is almost certainly a

19    list of Samsung email addresses.  This could

20    have been litigation from when I was a

21    litigator back in -- at Kaye Scholer back in
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 82 of 209

Page 83

1    the day.  This would have been any number of

2    things over an entire career of collecting

3    email addresses and contacts.  This is

4    representative of that.  And given the size

5    of Samsung, it's not surprising that Samsung

6    is artificially represented here in such a

7    big way.

8         Q.    Of these 38 people that are

9    listed in the email addresses here on this

10   UP 18 to UP 20, how many of those do you

11   believe Unified has met with in the time

12   that Samsung's been doing business with

13   Unified?

14        A.    A dozen, maybe 15 to 20.  I mean,

15   it's big.  And when we go to -- my

16   experience has been when you go to Asia,

17   they bring lots of people to meetings.  This

18   is not just like Samsung.  Like basically

19   most of the countries, my experience is when

20   you meet with them in Asia, they tend to

21   bring large numbers of people of meetings.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 83 of 209

Page 84

1          Q.      Do you have a regularly scheduled

2     meeting with Samsung?

3          A.      We have a regularly scheduled

4     meeting that we've thrown on the calendar.

5     Samsung almost never shows up to it.  They

6     just -- just because of time difference and

7     otherwise, they tend not to show up to the

8     monthly call that we've put on the calendar.

9          Q.      So you have a monthly call with

10    Samsung?  How many people from Samsung are

11    involved with that?

12         A.      Usually just one.

13         Q.      Who is that?

14         A.      ███████████████.  Let me find

15    him.  I think his named is spelled ████████

16    ████████.  I think that's how you spell his

17    name.  I think we could look through these

18    email addresses, but --

19         Q.      That's fine.  And so typically

20    you do a monthly meeting with Samsung and

21    the person involved is ███████████?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 84 of 209

Page 85

1        A.     Typically we don't do a monthly

2    meeting as they never call.  He doesn't call

3    in.

4        Q.     When you say meeting, it's not an

5    in-person meeting, correct?

6        A.     Not an in-person meeting.  So

7    this would be something we put on the

8    calendar and we call in just to see --

9    typically we call in to highlight like if

10   anything -- if there's any activity in the

11   zone or anything, kind of like the same

12   marketing material.  Hey, we did activity in

13   the zone, this is what's happened.  This is

14   our opportunity to keep, you know, the

15   relationships in contact.  Pretty standard

16   business activity.

17       Q.     How often does somebody from

18   Samsung show up on one of these calls?

19       A.     Maybe a couple of times a year.

20   It tends to -- meetings tend not to happen.

21       Q.     A couple of times a year.  Is

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 85 of 209

Kevin Jakel   Confidential
October 15, 2019                                    86

Page 86

1   there any particular events that spur those

2   calls and the participation in the call?

3   For example, after an IPR is filed, is that

4   normally when Samsung shows up for a call?

5          A.     No.

6          Q.     Is there any particular event

7   that causes Samsung to show up for one call

8   and not for another call?

9          A.     So typically -- I mean, the only

10  thing I can think of where we end up -- like

11  the communication starts up again is kind of

12  around renewal time.  So there's a process

13  for renewal and we will send an email and we

14  will say, hey, it's renewal time, we're

15  going to do our standard, you know, renewal

16  deck, send it over, we'll have a

17  conversation, we'll walk through what we did

18  last year and show you the work we've done.

19              So that is -- that's typically

20  when things happen in terms of like

21  communications.  But I don't know of any

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 86 of 209

Kevin Jakel  Confidential
October 15, 2019                                    87

Page 87

1    like reason why, on some occasion, Samsung

2    calls into on a call and when they don't.

3         Q.     Do you do any meetings with

4    Samsung in person?

5         A.     We do.  When we go over to Asia

6    for business meetings, we always stop by and

7    say hi to Samsung.

8         Q.     And how often do you do that?

9         A.     Probably three times a year, I

10   think, is a fair estimate.

11        Q.     And what are the meetings --

12   what's the general content of the meetings

13   that you have three times a year with

14   Samsung?

15        A.     The last couple of years, the

16   general content has been trying to get them

17   to participate in our standard essential

18   patent zone.  That's been the content of

19   what we've really talked about when we've

20   been over there.

21               We've been on sales activities,

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 87 of 209

Page 88

```
 1    not just with Samsung.  It's like ███ and

 2    ██████   and we don't normally go to ██████

 3    when we're over there.  It would be like

 4    a -- when we organize it, we try to make it

 5    efficient and see as many companies as we

 6    possibly can when we're over there.

 7         Q.    So this is basically like a sales

 8    trip that you try and hit as many companies

 9    as you can?

10         A.    Yes.

11         Q.    And as part of that trip, do you

12    also do communications about their current

13    membership?

14         A.    Sure.  I mean, we're always

15    talking to them about their current

16    membership if we -- and always talking to

17    all of our members about their membership.

18    It's a process.  Mostly the -- the

19    conversation about our current membership,

20    like on NPE zone when we want them to renew,

21    that's a much more structured conversation.
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 88 of 209

Kevin Jakel  Confidential
October 15, 2019                                  89

Page 89

1    Like we have a presentation and we would

2    present it and then we would show them what

3    we did in the last year and then we would

4    say, you know, if you like the work we did

5    on behalf of the zone, sign up again.  If

6    you don't like it, you don't have to sign up

7    again.

8         Q.    What was in this presentation?

9    What kind of information?

10        A.    It's like the zone information.

11   Basically here's all the activity we did in

12   the zone, here's how much money we spent in

13   the zone, how much money we spent on IPRs,

14   on each individual one.

15        Q.    So the cost of each particular

16   IPR is shared?

17        A.    Yes.

18        Q.    Is that for all IPRs or just for

19   that particular member?  For example, when

20   you have -- strike that.

21             So when you had the meeting with

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 89 of 209

1    Samsung, do you discuss all of the IPRs in

2    the zone or do you discuss just the IPRs

3    that involved Samsung?

4         A.    We discussed all of the IPRs in

5    the zone.  So we will have a list of

6    everything that we did for the zone and all

7    of the kind of high-level zone activity and

8    we say this is -- you know, we think that

9    ultimately we've done a bunch of good work

10   in the zone and we think that we're

11   ultimately deterring bad patents from the

12   area.  And then we say, you know, if you

13   want to renew again, this is the fee, and

14   that's the kind of structured thing.  But we

15   would walk through like the presentation and

16   make kind of a renewal presentation.

17        Q.    So is the presentation the same

18   for all members?

19        A.    Well, it depends on what zone

20   they are participating in and it depends

21   upon like what -- if an IPR was done two

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 90 of 209

Page 91

1    years ago, you know, if it's not active

2    during someone's time period, then it will

3    fall off the list, you know, and new IPRs

4    will get added.

5              So other than like -- yes, all

6    the presentations are the same except for

7    like the -- depending on the zone that

8    someone's participating in or zones, for

9    that matter, and based on like the timing.

10   So if someone's -- you know, someone's

11   renewal deck in, you know, March of 2019

12   will look different than one that was filed

13   in -- or that what was created in September

14   2019 because of the timing of things.

15        Q.    Why do you tell Samsung the cost

16   of each IPR?

17        A.    So that's kind of legacy

18   information from when I started the company.

19   So when we started the company, there was

20   like a -- I felt like there was a need for

21   like a level of transparency that people

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 91 of 209

Kevin Jakel  Confidential
October 15, 2019                                    92

Page 92

1    would see, like, work getting done and all

2    of that.

3              So a lot of that had to do with,

4    you know, RPX at the time.  RPX was out

5    there and a big part of their thing was no

6    one kind of knew what they were spending and

7    how much and so people -- you know, RPX does

8    something very different than us.  They

9    basically buy licenses out of litigation,

10   but that made a lot of people, including

11   myself, kind of like uncomfortable about the

12   fact the money being spent to buy licenses

13   would incentivize more NPE litigation.

14             So when I started the company, I

15   wanted there to be kind of a level of kind

16   of transparency that, hey, you're going to

17   join a zone and if we take activity on

18   something, we'll show you the number that we

19   kind of spent on that activity so that we

20   can kind of be a little bit more transparent

21   than what RPX kind of was way back then,

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 92 of 209

Page 93

1    because we were going to be doing something

2    very different and we wanted kind of in many

3    ways just distinguish ourselves from RPX.

4              RPX had all this kind of cloud of

5    secrecy around how they did deals and what

6    they did and everything like that and we

7    wanted to find a way to be way more

8    transparent and not have that kind of cloud

9    of secrecy around us.

10        Q.    So you give them, Samsung,

11   information as to each IPR, the cost of each

12   IPR that's been filed and the zones it's a

13   member of, correct?

14        A.    Yes.

15        Q.    Is that cost that outside

16   counsel, expert costs and filing fees or

17   does it also include the costs for -- well,

18   is that the only cost?

19        A.    It's typically an estimate.  I

20   mean, we try to get it as close as possible,

21   but I think law firms are sometimes

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 93 of 209

Page 94

```
 1   notoriously bad at getting bills to us on

 2   time, so we tend to get it as close as we

 3   can as to what those actual costs are.  But

 4   it is supposed to be kind of our full costs,

 5   so lawyers, experts, filing fees, you know,

 6   if there's costs that we kind of internally

 7   have that are easily set aside to say, yeah,

 8   that's -- clearly can say we spent this much

 9   money internally on something, then we might

10   try to apportion internal expenses to it.

11   But to be honest, that's really hard.

12        Q.    So earlier I think you said that

13   sometimes you do -- Unified does IPRs

14   in-house, correct?

15        A.    Yes.

16        Q.    How does Unified apportion the

17   costs for an IPR and show that to its

18   members when it does an IPR in-house?

19        A.    Some of those numbers will be

20   really low.  It will only be ████████ or

21   whatever it is that will be spent in terms
```

Kevin Jakel  Confidential
October 15, 2019                              95

Page 95

1    of expert fees and others and filing fees

2    and everything on an IPR.  So those numbers

3    would be low compared to the amount we've

4    spent on something where, just for bandwidth

5    reasons or whatever reason it was, we had to

6    hire a firm.  And some firms are way more

7    expensive than other firms, so, you know,

8    whatever.  Whatever the numbers are, that's

9    what numbers go on the list.

10        Q.    So you don't try and include

11   overhead or your in-house attorneys' costs

12   in that IPR costs; is that correct?

13        A.    Like I said earlier, if there's a

14   way for us to kind of know, hey, we spent a

15   bunch of money on something because we

16   either had to do crazy amounts of prior art

17   searching or something else that we -- if we

18   can identify like, hey, we spent a bunch of

19   time and energy in-house on something and we

20   feel like we can actually, without wasting

21   all of our time tracking accounting,

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 95 of 209

Page 96

1    apportion something that's kind of internal

2    on G&A running the company to an IPR, then

3    we would do it if we could, but if we can't,

4    we don't do it.  So sometimes there's a

5    little bit of like, I guess, estimates

6    around, hey, this is the cost of an IPR to

7    us and sometimes that will include if a

8    particular patent costs us a little bit

9    more.

10                And this is kind of like great

11   information for benchmarking.  And, you

12   know, we always thought companies would find

13   it very interesting, partly because we do so

14   many IPRs, that this would be data that

15   would be valuable to people to benchmark if

16   they were going to be doing their own IPRs.

17        Q.    So each individual IPR in the

18   zone that the member is part of, the cost of

19   that is given and then is there a cost given

20   for the IPRs in which that member was

21   involved in litigation?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 96 of 209

1        A.    I guess I don't understand your

2     question.  All of the IPRs that met the zone

3     definition would be included on the list

4     regardless of whether or not that member was

5     in litigation or not.

6        Q.    Do you in any way explain to

7     Samsung or other members which of those IPRs

8     involved that member?

9        A.    No.  I mean, we're not going to

10    go through kind of which IPRs are specific

11    to their litigations or not.  That is -- I

12    mean, that's not what the conversation is

13    about.

14       Q.    So what information does giving

15    the specific IPR or for each individual IPR

16    cost give to Samsung?  So you'll give a

17    number -- what's the general range for the

18    IPR cost that you would tell Samsung?

19       A.    I mean, I don't know.  Any -- if

20    an IPR has just been filed, then the only

21    cost would be the filing fee, the expert

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 97 of 209

Page 98

```
 1   fees, prior art search fees, librarian fees

 2   or depends on like the nonpatent literature,

 3   like, you know, like that would be just --

 4   you know, it's up to that point.  Like we

 5   create the presentation at a point in time.

 6   We look at the cost of what we think has

 7   been spent on that IPR.  We include it.

 8            Now, if an IPR is really old,

 9   it's been going on in the zone for a year

10   and a half, then that number could be the

11   full cost of the IPR all the way through a

12   final written decision or even an appeal.

13   Like the numbers, if they add up over time,

14   will look like, you know, the fully loaded

15   cost of taking an IPR all the way through to

16   conclusion.

17       Q.   And I don't need specific

18   numbers.  I'm just trying to get -- so

19   you'll give them an early stage, say, it

20   will be 50 grand and late stage, it will be

21   300 grand.  Is that a kind of fair range
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 98 of 209

Page 99

1    that the individual IPR costs will be in?  I

2    don't need specifics.  I'm just trying to

3    get an idea of what the range of these

4    individual numbers that you're giving to

5    them look like.

6         A.    I mean, it doesn't -- whatever

7    the number is, it is.  I mean, there have

8    been IPRs that have been over ███████ spent

9    on it because it just happened to go all the

10   way through appeal and there was lots of

11   complications or issues or -- I don't know.

12   It could also be that we handled it

13   completely in-house and had nothing and it

14   could have been just, you know, whatever,

15   ██████ for -- I don't know like -- I mean,

16   whatever the numbers are for the amount that

17   we believe we've kind of spent on that IPR,

18   at the moment that presentation is created,

19   we just slap them in there.

20              This is not -- there's no thought

21   process that goes into it.  There's just

Page 100

1    what the numbers are at that particular

2    moment in time.  Whatever they are, they

3    just go on the presentation.

4        Q.    So what's the least amount

5    Unified's ever spent on an IPR?  You said

6    ████.  Is that about right?

7        A.    I don't know.  I mean, I think --

8    I don't know.  I mean, that would kind of be

9    the minimum is the cost of getting on file.

10   I don't know if we've ever filed an IPR

11   without an expert declaration, but it's

12   possible.  I don't recall anymore.  I think

13   we're up to 170 or so.

14            So at this point, we're way

15   beyond my memory on the individual IPRs, but

16   that would be kind of the bare minimum that

17   you possibly could do it.

18       Q.    And what's the most Unified's

19   ever spent?

20       A.    I'm not sure I know that either.

21   But I believe we have spent over ████ on

Kevin Jakel  Confidential
October 15, 2019                                    101

Page 101

1    an individual IPR through appeal and

2    otherwise.  I think that's probably in the

3    accurate range.

4         Q.    So for cases that actually go to

5    a final decision, I guess when you give

6    these costs, do you tell Samsung where the

7    case is and, you know, kind of why the

8    numbers are where they are?

9              So, example, you just said, you

10   know, it's the beginning of a case and so

11   we've just done a filing fee and maybe an

12   expert and that's cost us X amount and then

13   here's 10 other ones that we have in the

14   zone and they're all -- they've all gone to

15   final decision this year.  Do you include

16   that information with each cost breakdown?

17        A.    No.

18        Q.    So literally you're just giving

19   an IPR number and how much money you've

20   spent, like a spreadsheet of kind of each

21   one of those -- each number; is that right?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 101 of 209

Kevin Jakel  Confidential
October 15, 2019                                    102

Page 102

1        A.    Yes.  So it will just

2   literally -- we're talking about these

3   numbers, it's literally just a chart that's

4   got -- it's typically just the name of the

5   NPE because patent numbers are too difficult

6   to memorize.  So it's the name of the patent

7   owner and the amount that we have spent to

8   date on that.  There's no status information

9   or anything related to that -- like that

10  number is just like here's what we've spent

11  to date.  We are almost always like talking

12  about like the zone as a whole, like here's

13  what has happened in the zone --

14       Q.    So the number you usually discuss

15  with Samsung is the -- we've spent X million

16  dollars on the zone or how -- the larger

17  number that's all of the IPRs combined; is

18  that right?

19       A.    Like we summarize that number.

20  We summarize that number for every single

21  zone and presentation that we create.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 102 of 209

Page 103

1        Q.      So for Samsung, when did you do

2    the presentation for Samsung last?

3        A.      We're actually in a -- the most

4    recent one is from the end of last year.  So

5    we're to be meeting with them and presenting

6    to them in a few weeks.

7        Q.      Do you remember what the number

8    was for how much Unified spent for the zones

9    that Samsung is a member of last year?

10       A.      No.

11       Q.      Do you have a rough estimate?

12       A.      The content zone typically has █

13   ████████████████████████████████████████

14   ██████████████████████████████████████████

15   ██████████████████████████████████████████

16       Q.      And it's a couple -- it's about,

17   approximately -- I mean, it's ████████████

18   ██████████████████ --

19       A.      ██████████████████████████

20       Q.      In that approximate range?  How

21   varied is that number that you present to

1    Samsung for each year?  Do you tell Samsung

2    that number's gone up by 10 percent or that

3    number's gone down by 10 percent?

4             Do you do comparisons year to

5    year?

6         A.    No.

7         Q.    Do you know how much variability

8    there is in that number since Samsung's been

9    a member?

10        A.    I have no idea.  I mean, I can

11   tell you that I know it's been going up

12   because we've been growing.  So like more

13   people participate in a zone, then the zone

14   has more resources to do more work.  So

15   that's not what it did last year.  I don't

16   know what -- high-level number -- I don't

17   know what it did this year off the top of my

18   head.  Like this is -- it has been growing

19   up just because we've been growing over the

20   years.

21        Q.    Do you tell the members what

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 104 of 209

Page 105

1    percentage of their subscription fees are

2    going to IPRs?

3         A.    Nope.

4         Q.    So all they have is just an

5    overall -- they have each individual IPR and

6    the overall IPRs as a total, but they don't

7    know what percentage that is of the overall

8    revenue in that particular zone?

9         A.    No.

10        Q.    So what's the purpose of telling

11   them all these numbers?  Like how does that

12   sell them on the new membership?

13             MR. FAWZY:  Object to the form.

14             THE WITNESS:  I was just going to

15   say, like I don't -- I know why we put it in

16   there and that's because when I first

17   started the company, I thought it was a good

18   idea to have a level of transparency.

19             So if you look in our membership

20   agreement, you will find in there ████

21   ████████████████████████████████████████

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 105 of 209

Page 106

1   ████████████████████████████ and I've

2   never once thought one way or the other

3   about whether it's needed or not needed.

4   But contractually, I'm obligated to ████████

5   ████████████████████████████████████

6   ████████████████████████████████

7   ████████.

8          We meet some of those obligations

9   by ████████████████████████████████

10  ████████████████████████████████████

11  ████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████

14          BY MR. HARRINGTON:

15     ████████████████████████████████████

16  ████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████

19     ████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 106 of 209



American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 107 of 209

Page 108



American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 108 of 209



American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 109 of 209

Page 110



American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 110 of 209

Page 111

13        Q.    Can you go to Exhibit 3, the

14   membership agreement?

15             MR. FAWZY:  And any time you feel

16   like taking a break.

17             MR. HARRINGTON:  This is a good

18   breaking point if you guys want to take a

19   quick one.

20             MR. FAWZY:  If it's okay with

21   you.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC

Page 112

1              MR. HARRINGTON:  Yes, it's fine

2    with me.

3              (Brief Recess.)

4              BY MR. HARRINGTON:

5         Q.    Earlier we were talking about

6    kind of the individual IPR costs.  Do you

7    have an idea of what the average IPR cost is

8    for a case that goes all the way through to

9    final decision is for Unified?

10        A.    All the way through to final

11   written decision or appeal?

12        Q.    Final written decision.

13        A.    That's probably close to ████████

14   is my guess, it goes all the way to

15   decision.

16        Q.    And you said through appeal.

17   Does Unified -- how many appeals has Unified

18   done?

19        A.    I don't know.  Half a dozen

20   maybe.  Off the top of my head, I don't know

21   exactly.  A handful.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 112 of 209

Page 113

1       Q.    Let's go to the membership

2    agreement.

3       A.    Okay.

4       Q.    Is there anything in this

5    agreement that prevents Samsung from

6    contacting Unified?

7       A.    There is -- I mean, there's

8    nothing in here that prevents them from

9    doing that.  Contacting Unified is perfectly

10   fine in our opinion.

11      Q.    Is there anything in this

12   agreement that prevents Samsung from

13   discussing IPRs with Unified?

14      A.    I don't think there's anything in

15   here that prevents Samsung from calling and

16   asking about an IPR.

17      Q.    Is there anything in this

18   agreement that prevents Samsung from making

19   requests concerning a particular IPR?

20      A.    Yes.

21      Q.    Where is that?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 113 of 209

Page 114



American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 114 of 209



American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 115 of 209



20          Q.    So Unified's position is that it

21     could -- it would be

Kevin Jakel  Confidential
October 15, 2019                              117

1    to reduce NPE litigation in a zone to not

2    file any IPRs on behalf of a particular zone

3    in a given year?

4         A.    Probably, yes.  I mean, our point

5    is that we think that the full scope of

6    everything we do is what generates our

7    deterrence.  In our own decision-making

8    authority, we also think that filing IPRs is

9    a particularly beneficial one, like we get

10   the most bang for our buck in terms of

11   generating a deterrence by -- for the zone

12   by using IPRs.

13              But we could file ex parte

14   re-examinations.  We could do prior art

15   search and publish it against individual

16   patent owners.  We have a program we call

17   patrol, which allows us to put patents up on

18   a platform and have people submit prior art

19   as a -- for an award.

20              Like there's lots of things that

21   we can do.  Filing IPRs is one of the most

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 117 of 209

Page 118

```
1    expensive, but we don't necessarily believe

2    that it's the only thing that we do that

3    helps generate a deterrence for a zone and

4    so it's the full scope of what we do is what

5    we think -- you know, it's our reputation.

6    It's our position.  It's everything about

7    what we do that we think is valuable for the

8    creation of deterrence for the zone.  But

9    when it comes to filing IPRs, we personally

10   believe that they're effective in showing

11   that the use of bad patents can

12   ultimately -- it's a big function of how we

13   deter that activity.

14        Q.    ██████████████████████████████
```

Page 119

15      Q.      You said that IPRs are one of the

16    most effective ways to generate deterrence;

17    is that right?

18      A.      It's our opinion that we think

19    that -- I mean, the thing that we get from

20    an IPR is to show that a patent should never

21    have issued in the first place and it was a

Kevin Jakel  Confidential
October 15, 2019                                    120

Page 120

1    bad patent.

2              And IPRs give us a means in which

3    to show that to not just the NPE that we've

4    filed the IPR against, but that lots of the

5    other either institutional NPEs, companies

6    that already exist, either patent owners or

7    individual inventors and everyone, that,

8    hey, we want everyone to see when bad

9    patents are used in a zone.

10             And then those patents are

11   identified as invalid because we took action

12   and showed that to the world through an IPR.

13   So we think that is a tool that does that.

14   There are other things you could do.  You

15   could publish prior art or even publish

16   prior art along with claim charts and a

17   whole huge analysis for -- and there's lots

18   of things you can do.  But one of the things

19   that we've decided is that we think filing

20   IPRs accomplishes those things and some

21   more.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 120 of 209

1       Q.    Has the publishing prior art

2  method ever been shown to be an effective

3  deterrent in any way in any particular

4  instance?

5       A.    We think so.

6             MR. FAWZY:  Objection.  Objection

7  to form and vague.

8             THE WITNESS:  I mean, we think

9  so.

10            BY MR. HARRINGTON:

11      Q.    And what was the evidence that

12  that was a deterrent?

13      A.    I'm not necessarily saying that

14  it was evidence, but we think so.

15      Q.    What's that based on?

16      A.    I don't think patent owners are

17  interested in seeing their patents put up on

18  a platform to have everyone take a crack at

19  seeing if there's prior art against them.  I

20  think that's not something that patent

21  owners want to see because I think lots of

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 121 of 209

Page 122

1    them -- we then take that prior art, we look

2    at it and if we think some of it's good,

3    then we pay to submit a reward.  But we

4    didn't turn around and publish that to the

5    world.

6              So in terms of this one control

7    platform, we have the prior -- the crowd

8    source kind of prior art solution.  We do

9    think that putting prior art out there in

10   the public domain is something that future

11   defendants who might be -- you know, have

12   this patent asserted against them are going

13   to be able to look at and use.  So we do

14   think that it ultimately generates that

15   deterrence.

16        Q.    Has that ever resulted in an

17   invalidated patent?

18        A.    I don't know.  I mean, we put the

19   prior art out there.  I don't know who has

20   looked at it and who has not.  But if we've

21   turned over something and a patent owner

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 122 of 209

Kevin Jakel   Confidential
October 15, 2019                                123

Page 123

1    actually looked at it and found a piece of

2    prior art that covered their own patent, I

3    would hope they took that as an opportunity

4    to not assert a patent that that piece of

5    prior art has shown to be potentially

6    invalid.  That's just as likely as others

7    using it.

8         Q.    But as far as you're aware, no

9    one has actually ever invalidated a patent

10   based on the crowd sourcing method?

11        A.    Not to my knowledge.  I

12   haven't -- we haven't -- I'm not sure we

13   ever even looked.

14        Q.    How many IPRs has Unified filed?

15        A.    I think we have filed 170 or so.

16   We're in that ballpark.

17        Q.    And what percentage of that 170

18   have settled?

19        A.    I think less than a third.

20        Q.    More than a quarter?

21        A.    How many is a quarter?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 123 of 209

Kevin Jakel  Confidential
October 15, 2019                                    124

Page 124

1        Q.    I'm just trying to get a --

2        A.    No, I know I -- I can't do the

3   math that fast.  I would say probably

4   between 20 and 40.

5        Q.    Twenty and 40 percent or 20 and

6   40 --

7        A.    No, 20 total.  Between 20 and 40.

8        Q.    Of 170, between 20 and 40 have

9   settled?

10       A.    Yes.

11       Q.    That's fine.  How many of the 170

12  resulted in a final decision on which the

13  patents were invalidated?  Totally,

14  completely invalidated?

15       A.    I don't know the stats off the

16  top of my head.

17       Q.    Is that something that's on

18  Unified's portal?

19       A.    I mean, these -- like if you get

20  into -- I mean, these can be generated from

21  either our own portal or other third-party

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 124 of 209

1  portals.  You just type in like success

2  rate, identify the petitioner and there are

3  tools out there.  We don't always agree with

4  exactly how they calculate success, but like

5  these are all -- this is all public

6  information.

7       Q.    Do you have any idea of the

8  number of patents just roughly -- well, so

9  does Unified keep track of a win rate?

10      A.    We do.  We do keep track of like

11  a -- what we call kind of a success rate.

12      Q.    And what is Unified's -- what is

13  the number for their success rate?

14      A.    Off the top of my head, I don't

15  know what it is right now from, like going

16  back to the beginning of time.  I think we

17  were all pretty proud of, in 2018, we had

18  a -- what we would consider a success rate

19  of 85 percent.  So that's -- we thought that

20  was a good number.

21      Q.    And when you consider success

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 125 of 209

Kevin Jakel  Confidential
October 15, 2019                                    126

Page 126

1    rate, does that mean that all claims and all

2    patents have been canceled?

3         A.    No, because it's really

4    complicated to try and calculate success on

5    a claim-by-claim basis.  So if we got

6    instituted, that would be success.  It's

7    like a moment, like a snapshot in time.  So

8    if we got an institution decision in 2018

9    and it got instituted, then that would have

10   been a positive, would have been a success,

11   although that would be true even if we only

12   got instituted on one claim.

13             If we -- although that has

14   changed now with the SAS decision.  So,

15   anyway, you get the point.  If we get

16   instituted, that's a positive.  If we get a

17   final written decision where we cancel the

18   claim, that's a positive as opposed to a

19   negative.  I mean, could be true even if we

20   got one claim canceled and all the others

21   survived, it's still true that we consider

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 126 of 209

Kevin Jakel  Confidential
October 15, 2019                          127

Page 127

1    it positive.

2              Then if an IPR were to settle,

3    then we would consider that a positive.

4    Basically anything that happens where we

5    feel like we are creating a deterrence, we

6    would consider that to be positive.  And

7    then the other category here would be either

8    we lost at final written decision or we lost

9    an institution decision.  Both of those

10   would be negative outcomes where we -- you

11   know, those don't generate deterrence.  And

12   that would be how we calculate kind of

13   success rate in 2018.

14        Q.   So can you think of a better way

15   of generating deterrence than filing IPRs

16   for Unified's members?

17        A.   Well, we don't generate

18   deterrence for Unified's members.  We

19   generate deterrence for the zone.  So --

20        Q.   I'll start over.  Is there a

21   better way of generating deterrence for a

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 127 of 209

Kevin Jakel  Confidential
October 15, 2019                               128

Page 128

1    zone than filing IPRs?

2         A.    I guess it's possible.  I mean,

3    we've been trying to -- and we're constantly

4    looking at new ways to do what we do.  I

5    mean, this is an ongoing effort, so this --

6    IPRs are one tool that we use.  It's not the

7    only tool that we use.

8              Is it the -- it's kind of the

9    most expensive one, so like if it sucks up

10   like a disproportionately large amount of

11   our activity goes to -- or revenue I guess

12   goes to IPR activity as opposed to the other

13   things that we consider in the zone, but --

14   and we do think it's the most effective at

15   kind of showing that a patent should never

16   have issued in the first place.

17             But, I mean, like I said, if

18   people would take the fact that we've found

19   IPR -- sorry -- that we found prior art

20   seriously and that we would maybe publish

21   that kind of information and everyone would

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 128 of 209

1    take advantage of it, that might be, you

2    know, equally influential in the future.

3              Just right now, it feels like the

4    only time you can ever get someone to

5    acknowledge a bad patent is if you take it

6    all the way to, you know, either a district

7    court litigation where someone shows that a

8    patent is invalid or you get the PTAB to do

9    it.  But my experience has been over the

10   years that other than one of those two

11   things happening, invalidity is something

12   that patent owners kind of refuse to kind of

13   look at and take seriously.

14        Q.    So as you sit here today, do you

15   think that filing IPRs is the best strategy

16   for Unified to deter NPEs for a particular

17   zone?

18        A.    As of today, it is one part of

19   the overall strategy and I think it is one

20   of the most important things that we do as

21   an overall process of creating deterrence

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 129 of 209

Page 130

1    for our zones.

2        Q.    How does Unified know that its

3    members are satisfied?

4            MR. FAWZY:  Objection.  Calls for

5    speculation.

6            THE WITNESS:  Yeah.  I was just

7    going to say, like I don't know that they

8    are satisfied.  I know that they have

9    renewed and so by that -- that I think is a

10   good thing, that we are generating

11   deterrence for zone and we continue to get

12   paid to generate deterrence for the zone.

13           But in terms of like whether or

14   not they're satisfied or not, I think that's

15   something you'd have to ask them.

16           BY MR. HARRINGTON:

17       Q.    Have any Unified members ever not

18   renewed their membership?

19       A.    Yes.

20       Q.    Who?  You don't have to list all

21   of them.  Give me an example.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 130 of 209

```
1        A.      Yeah.  So off the top of my head,

2    ████████  is a company that was once a member

3    and is not and we hope some day comes back.

4        Q.      Why did ████████ tell you that

5    they were not renewing?

6        A.      They had budget issues and said

7    that -- I think they had a -- either a new

8    GC or someone, you know, kind of changed at

9    the top.  And it's my understanding that the

10   budget was basically completely wiped out

11   and everyone had to redo their budgets and

12   they needed to identify what they were going

13   to -- they had reduced budgets.

14              So everything that was being

15   spent got all wiped out and the total amount

16   of what they were allowed to spend in their

17   departments was reduced from where it was

18   before and then they needed to see if they

19   could find budget.

20              And it's my understanding that

21   despite working really hard to try and stay
```

Page 132

```
1    a member, there just wasn't a budget to

2    remain a member of Unified.

3         Q.    As part of that process, did

4    Unified go do a pitch and explain kind of

5    the value it was adding to ██████████

6         A.    Sure we did, yeah.

7         Q.    What was the main pitch that

8    Unified made to ██████████

9         A.    The main pitch was we think that

10   it's a good thing to be working and paying

11   us to protect the key technology areas and

12   this is something that we think ultimately

13   benefits the zone.  This is the same pitch

14   that every trade association makes to a

15   company that asks them to continue to

16   participate, that, listen, in the long run,

17   if you participate, then we're going to have

18   a benefit for the technology and, you know,

19   all boats rise with the tide.

20              So that's the pitch we would have

21   made to ██████████  that it made sense for them
```

Page 133

```
 1    to participate, because we wanted to create

 2    the deterrence for the zones that they had

 3    been participating in.

 4         Q.    So you didn't make a business

 5    case for ████████ like here's how you're

 6    going to make extra money or anything like

 7    that?

 8         A.    No.

 9         Q.    There's not a particularized

10    showing as to why this would be beneficial

11    to ████████

12         A.    No.

13         Q.    Have you ever made it a business

14    case to anybody when they've dropped out,

15    said, look here, here's how we're saving you

16    money?

17         A.    No.

18         Q.    Is there a business case to be

19    made?

20         A.    I mean, I guess we're making the

21    same business case that every trade
```

Page 134

1    association makes, that, yeah, like

2    there's -- if we are successful in deterring

3    NPE activity from a zone, then everyone

4    within that zone is going to be able to save

5    because NPEs won't be targeting that

6    technology area and so there will be more

7    freedom to operate for every company that's

8    participating in the zone.

9              And, yeah, we make -- this is

10   just the same type of business case that is

11   made when you're trying to do something on

12   behalf of a technology area or an industry.

13   You make the business case, that all boats

14   will rise with the tide if ultimately we're

15   successful.

16         Q.    Has Unified ever tried to make

17   that business case for a particular zone,

18   for example, say, you know, before

19   Unified -- the year before Unified, you

20   know, started its NPE practice, it -- you

21   know, this zone paid X million dollars in

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 134 of 209

Kevin Jakel  Confidential
October 15, 2019                                135

Page 135

1    licensing fees to NPEs and the year after,

2    the zone paid, you know, 80 percent of that

3    number or something?  Is there any kind of

4    business case like that that Unified's ever

5    tried to put on?

6          A.    We wouldn't know those numbers in

7    any way.  So like we -- I think one of the

8    premise that probably you might need to know

9    is that we explicitly tell our members that

10   we are not their attorneys and there is no

11   attorney-client relationship between us and

12   our membership.  So we make that clear both

13   during our pitches and through everything

14   else.  So companies don't share with us the

15   kind of information that you are

16   referencing.

17               And companies don't share with us

18   their settlement agreements or numbers or

19   licensing fees or like we're not on the

20   inside of the legal departments for these

21   companies in any way.  We're not -- we don't

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 135 of 209

Kevin Jakel   Confidential
October 15, 2019                                    136

Page 136

1    have any access to any of that kind of

2    information.

3                    And even if we were to ask for

4    it, because we're not -- because we're not

5    a -- we don't have an attorney-client

6    relationship with anyone, we -- like no one

7    would share that with us.  They don't share

8    their litigation strategies.  They don't

9    share their settlement strategies.  There's

10   no communication about anything between us

11   and them, about any particular litigation

12   they have or anything because everyone --

13   you're a litigator.  I mean, you don't waive

14   privilege on any of this.  So companies know

15   that they're not going to waive privilege

16   because they don't know how far that waiver

17   may go.

18                    So we make sure everyone is aware

19   of the structure of Unified and everyone

20   knows, hey, like if we talk about things,

21   then, like and I'm under -- getting deposed,

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 136 of 209

Page 137

1    I'm going to have to tell everyone what we

2    talked about.  This is -- and you don't want

3    to waive privilege and have privilege go

4    someplace that you don't know where it's

5    going to go and we don't want you to do

6    that.  We're going to -- for all of those

7    reasons, we are independent and we're not

8    going to be a part of any of those things.

9              So in order to maintain our

10   independence, we keep this all separate,

11   like this is part of what we want is to have

12   a third party that can go out, do the work

13   that we want to do and we don't want to get

14   involved in any way with what they've got

15   going on inside their legal department.

16       Q.    Has Unified ever received any

17   other feedback from a member that's not

18   renewing aside from budgetary concerns?

19       A.    Not to the best of my knowledge.

20   I mean, I'm trying to think back.  There had

21   been a couple of companies who were

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 137 of 209

Kevin Jakel  Confidential
October 15, 2019                                              138

Page 138

1    purchased by others and so when it came time

2    for renewal, the decisionmaker had changed

3    and the original member no longer had the

4    authority to kind of remain a member.

5              But in that situation, it just

6    turned into, you know, we went and made a

7    pitch to the new, you know, owner and said,

8    hey, under those circumstances, the way

9    Unified works, the new company as a whole

10   needs to join Unified, not just like that

11   one piece.

12             So we have affiliate language in

13   our agreement, so like we kind of treat

14   companies as a whole.  So we would have gone

15   to the new owners and tried to convince them

16   to join.  And I know of a couple of

17   companies who ultimately did not join so

18   that those member were kind of no longer

19   members.

20        Q.    So has any member ever told

21   Unified when they've been sued for patent

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 138 of 209

Page 139

1   infringement?

2        A.     Sure.  But we know that someone

3   has gotten sued because we got the docket

4   report the same day as you do.  So like if

5   anyone -- every single litigation that

6   happens day in and day out every day, we are

7   aware of every single litigation that

8   happens.

9               So if we are talking to someone

10  about, you know, just industry information

11  and everything, I am certain we have had

12  conversations with members and nonmembers

13  because we're aware of the litigation that's

14  ongoing and I'm certain that litigation has

15  been a topic of, hey, you've been sued.

16  Yeah, we've been sued.

17              I mean, obviously we look at

18  every single one of those to decide whether

19  or not we believe it's an NPE or not, as an

20  example, but that's -- you know, those

21  conversations of course happen.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 139 of 209

Page 140

1        Q.      Has Samsung ever informed Unified

2    that it's been sued for patent infringement?

3        A.      Off the top of my head, I don't

4    recall any conversation with Samsung about

5    any specific litigation.

6        Q.      So Unified is monitoring the

7    patent filings.  After a member gets sued

8    for patent infringement, does Unified

9    contact that member?

10       A.      About the litigation?

11       Q.      Just the fact that it's been sued

12    for any reason.

13       A.      No.

14       Q.      So why is Unified monitoring the

15    patent litigations?

16       A.      Well, I mean, we monitor -- well,

17    in order to monitor NPE activity, you have

18    to monitor all litigation.

19       Q.      And why does that matter?  What

20    does NPE activity have to do with Unified's

21    business?

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 140 of 209

Kevin Jakel  Confidential
October 15, 2019                                    141

Page 141

1        A.     Say that again.

2        Q.     What does NPE litigation have to

3   do with Unified's business?  I mean, you

4   could have an NPE that sues just one company

5   and that doesn't mean anything about whether

6   those are good patents or bad patents,

7   right?

8        A.     I mean, we have what we call NPE

9   zones.  I guess I'll step back to the

10  beginning.  We have NPE zones.  In order to

11  know whether or not a patent fits one of

12  those zones and if it's an NPE and if we

13  consider it to be a threat to the zone and

14  whether or not we think that by filing an

15  IPR, as an example, would be a deterrent

16  activity for the zone, in order to do any of

17  all of that, we actually have to find that

18  patent.

19            So we will look at every single

20  patent litigation that gets filed.  We will

21  also look to see whether or not those

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 141 of 209

Kevin Jakel  Confidential
October 15, 2019                                    142

Page 142

1    litigations are brought by NPEs.  We will

2    also look to see whether or not those

3    patents will meet our zone definitions and,

4    if the litigation is NPE -- is an NPE

5    litigation and it meets a zone, then we will

6    start looking at that to see, hey, do we

7    think that patent is invalid and do we think

8    that there would be a deterrence value to us

9    taking action against it.

10               In order to do that analysis, you

11   have to look at the NPE litigation and in

12   order to look at NPE litigation, you've got

13   to look at all litigation.

14        Q.    I guess that's my question is why

15   is it?  I mean, there's plenty of NPEs that

16   don't file lawsuits and simply license

17   companies, correct?

18        A.    That's true.

19        Q.    So what does litigation have to

20   do -- I mean, you could follow, you know,

21   assignment records and kind of figure out

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 142 of 209

1   who has been assigned large quantities of

2   patents and --

3        A.    Sure.

4        Q.    -- kind of figure out IPRs based

5   on that.  Why do you need litigation records

6   in order to do that?

7        A.    We've done some of that.

8        Q.    So I don't understand why would

9   you need -- why wouldn't you just base

10  everything on that?  Why not base everything

11  on assignment records?

12       A.    Well, that would make up a very

13  small amount of all of the NPE activity.  I

14  mean, like --

15       Q.    Well, how do you know that?

16       A.    Well, it's our opinion of it is

17  we looked to see there's lots of litigation

18  going on and including some of these NPEs

19  that may or may not have ongoing litigation.

20  Some of them do and we would spot those

21  litigations by monitoring litigation.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 143 of 209

Page 144

1              We also watch for -- I mean, like

2      when we say we monitor, it's not just

3      litigation.  We also monitor for assignment

4      records.  So as an example, if IV sells

5      anything today, and they're selling lots of

6      stuff, we love to see that as, okay, they've

7      sold somebody, who did it go to, is that

8      going to go to an NPE and try to be

9      monetized, like as an example of what you're

10     saying.  All of that activity goes into a

11     bucket.

12              I didn't say that we only look at

13     NPE litigation.  We look at all of --

14     everything that we can find to get a

15     complete or wholesome view of all NPE

16     activity and then from that, we will pick

17     and choose which patents we think, if we

18     were to take action again, would generate a

19     deterrence value for our zone.

20     Q.    Are Unified members allowed to

21     tell Unified about the specific claims of a

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 144 of 209

Kevin Jakel  Confidential
October 15, 2019                                   145

Page 145

1   patent that are being asserted against them?

2       A.    We don't have conversations about

3   litigation to find out which claims are

4   being asserted or not.  And so this would be

5   something that we don't have that

6   conversation at all.

7       Q.    How does Unified know which

8   claims to file suit on, file an IPR on?

9           MR. FAWZY:  Just -- I don't think

10  you're going into this, but just object on

11  the basis of privilege.  But to the extent

12  you can speak generally without revealing

13  privileged info, please do.

14          THE WITNESS:  So the analysis for

15  any one patent and specifically what we did

16  there, we would consider that, I guess, to

17  be privileged here, but we tend to try and

18  file IPRs on as many claims as we have prior

19  art to cover.  So we don't pick and choose

20  our claims based on which companies have

21  seen claims asserted against them.  We don't

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 145 of 209

1    have that information.  That's not something

2    that we will always know.

3              BY MR. HARRINGTON:

4         Q.    Has a company ever -- Unified

5    member ever shared infringement contentions

6    with Unified?

7         A.    No.  We've never received

8    infringement contentions from a member.

9         Q.    I think earlier you said about █

10   ██████████  of Unified's revenue goes to outside

11   counsel and other IPR-related expenses,

12   outside expenses?

13        A.    Yeah.  I mean, it might be a

14   little bit less than that.  I don't know.

15        Q.    Does that number vary per year?

16        A.    Sure.  And we are trying to bring

17   that number down so that we can be more

18   profitable, right?  But not necessarily by

19   doing less or more work, but just by, you

20   know, being efficient with our revenue that

21   either hiring attorneys who do good work,

1   but don't charge us as much or doing some of

2   that work in-house or there's any number of

3   ways in which we might make changes to our

4   expenses for how we do the work that we do.

5        Q.    Does that kind of attempt to

6   lower its costs run into conflict with the

7   provision in the contract that requires

8   Unified to ████████████████████████████

9   ████████████████████████████?

10       A.    I don't think so.

11       Q.    So if Unified said, hey, we think

12  it's ███████████████████ just to not

13  file any IPRs, you think you would still be

14  in -- and not do ████████████████████████

15  ████ do you think that's a fair assessment

16  to make?

17            MR. FAWZY:  Objection.

18  Improperly laid hypothetical.

19            THE WITNESS:  Yeah.  I mean, I'm

20  not sure -- I mean, if you -- there's a

21  bunch of things on that list, right?  So, I

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 147 of 209

Page 148

```
 1    mean, we are hired to go out and try and

 2    create a deterrence for our zone, but we

 3    have kind of sole control over how we choose

 4    to do that and that's -- I mean, that's what

 5    our agreement basically says.

 6                BY MR. HARRINGTON:

 7        Q.    Do Unified's members know

 8    Unified's profit percentage?

 9        A.    No.

10        Q.    How does Unified determine what

11    fees its members are going to pay?

12        A.    So our NPE zones, we have a fee

13    schedule that's in our membership agreement.

14        Q.    On ██████████

15        A.    As you can see in ██████████

16    So, yeah, in the context of a company, you

17    would take their kind of top line revenue,

18    you would plug it into the equation and then

19    that would kind of generate a fee for a per

20    zone amount.

21        Q.    How many of Unified's members are
```

Page 149

1    in the top category, the ████████████

2    ████████████████

3         A.    I think that -- you know,

4    companies that make over ███████████   Maybe

5    a handful.

6         Q.    Unified has -- is it like 200

7    members, somewhere around there?

8         A.    So we have companies that pay

9    nothing to participate.  So those are

10   companies that make under 20 million in

11   revenue, so they get into all of our zones.

12   So all of those companies are participating

13   in our zones.  And then those companies that

14   make over 20 million in revenue, they would

15   be, you know --

16        Q.    Where are you getting 20 million?

17        A.    So this agreement is for paying

18   members.  So this agreement is the agreement

19   that companies sign when they make over 20

20   million in revenue.

21        Q.    Okay.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 149 of 209

1        A.    If you make under 20 million in

2    revenue, you would be signing up on a

3    reduced version of this and, you know, they

4    basically get to be members, but they --

5        Q.    How many of those members are

6    there?

7        A.    So that's like ▇ , somewhere in

8    that ballpark.

9        Q.    And how many paying members are

10   there?

11       A.    There are like ▇ .  One of those

12   paying members is like a trade association,

13   which is CableLabs and ▇▇▇▇▇▇▇▇▇▇

14   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

15   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

16            So kind of depends on like how

17   you -- if you count all of the ▇▇▇

18   ▇▇▇▇▇▇ as individual members, you get

19   like ▇ .  If you count them as one, then

20   you get like ▇ , somewhere in that ballpark.

21   This is rough, but that's the right idea.

Page 151

1        Q.      For the nonpaying members, do

2    they get the yearly annual report and the

3    breakdown of IPR costs and all of that that

4    you were describing for Samsung?

5        A.      They do not.

6        Q.      So they're just -- they get the

7    benefit of the ███████████ and some of

8    the other activities, but they don't get the

9    full --

10       A.      They don't pay anything?  So --

11       Q.      -- the full ███, all of those

12   obligations that Unified takes on, they

13   don't get all of those obligations?

14       A.      Everything that is on there, we

15   don't obligate ourselves to generate a

16   report, but we do meet most of that stuff

17   through -- most of what's on there we

18   actually generate through public

19   information, too, and we just publish that

20   stuff to our portal.  But the obligation for

21   ████████████████████████████████

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 151 of 209

Page 152

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2        Q.    But you have obligated yourself

3    to do ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to file

4    IPRs on behalf of those companies?

5              MR. FAWZY:  Object to the form.

6              THE WITNESS:  Yeah.  We don't

7    have an obligation with anyone to file IPRs

8    on behalf of the zone.

9              BY MR. HARRINGTON:

10       Q.    I just said the exact words,

11   which is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   to -- and then one of the things you have to

13   do is to file IPRs?

14       A.    So --

15             MR. FAWZY:  Object to the form of

16   that question.

17             THE WITNESS:  Yeah --

18             BY MR. HARRINGTON:

19       Q.    Take all the contract language

20   and say whatever you have a ▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮ requirement to do, which I

Page 153

1    get that you're saying that may mean

2    nothing, but you have a contractual

3    obligation to do ███████████████████

4    ████████, correct?

5               MR. FAWZY:  Object to the form

6    again.

7               BY MR. HARRINGTON:

8         Q.    Does Unified have a ████████████

9    █████████████████  to make ██████████████

10   █████████████████  to do something for its

11   members -- for Unified -- or for Samsung?

12        A.    Samsung has signed this agreement

13   and we have obligations under the agreement.

14   The agreement says what it says.

15        Q.    Do the nonpaying members have

16   that same obligation that's set forth in

17   █████████████?

18        A.    And this is what I was trying to

19   explain.  I don't know exactly off the top

20   of my head what this agreement looks like

21   exactly for our smaller companies that

Page 154

```
1    they -- they pay us nothing and so we

2    don't -- like we need to -- this agreement

3    is different because obviously we don't get

4    paid.  So that is something that -- you

5    know, the agreement is different.  The exact

6    terms of that I don't recall off the top of

7    my head.  That agreement hasn't been looked

8    at in five years, six years.  I don't know.

9    Companies just sign up online by the way.

10        Q.    Does Unified negotiate its

11   membership fee or is it a set membership

12   fee?

13        A.    No, we will negotiate a

14   membership fee.

15        Q.    Has any member ever asked for a

16   refund?

17        A.    No.

18        Q.    Has any member ever asked Unified

19   for a justification of its fees outside of

20   what it's contractually required to do?

21        A.    I don't know what you mean by
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 154 of 209

Page 155

1    justification, but we do the same kind of

2    renewal process with every single member and

3    go through the data.

4         Q.    Does Unified solicit paying

5    members?

6         A.    Do we make pitches to companies?

7         Q.    That are already members.  For

8    example, one thing that you said is that you

9    were pitching Samsung to be part of the SEP

10   group.

11        A.    Sure.  That would be in a

12   separate contract, but yes.

13        Q.    What other kind of activities

14   like that pitch does Unified do to its

15   paying members?

16        A.    So right now we have our kind of

17   standard essential patent zones that, you

18   know, we would love companies to sign up for

19   us to work on behalf of standard essential

20   technology areas.

21             And we also have what we're

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 155 of 209

Kevin Jakel  Confidential
October 15, 2019                                    156

Page 156

1    calling the patent quality drive or

2    basically we've been pitching companies to

3    give us money so that we can kind of study

4    kind of the NPE landscape and what's going

5    on and the costs of NPE litigation and the

6    data around everything that's involved in

7    that.  So those two things are the only

8    pitches other -- if you're talking about an

9    existing member, the only other pitches

10   besides the zone they're already in would be

11   to either join more zones or join an SEP

12   zone or to participate in our kind of patent

13   quality drive.

14        Q.    Does Unified try and get Samsung

15   to sign up for additional zones?

16        A.    Over the years, we've definitely

17   tried to get Samsung to sign up for more

18   zones.

19        Q.    And how does that work?  What's

20   the pitch?

21        A.    The pitch is just like any other

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 156 of 209

Kevin Jakel  Confidential
October 15, 2019                                157

Page 157

1    zone for either a new member or an existing

2    one, that if they care about another

3    technology that they would like to see us

4    working in, whether it's a brand-new zone

5    that's never been launched before or it's an

6    existing zone that we have that we would

7    like them to join as well, the pitch is the

8    same just like it would be if they weren't a

9    member at all.

10              Just like a trade association

11   would say, hey, you know, this is something

12   that is good for the technology area and if

13   we're successful, then all boats will rise

14   with the tide.

15        Q.    Has Samsung ever complained about

16   a free rider effect of its membership?

17        A.    Free rider is something that

18   comes up not with Samsung.  I don't recall

19   ever talking with Samsung about free rider.

20   But free rider is something that actually I

21   hear more from like industry conversations

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 157 of 209

Page 158

1    than ever talking to kind of members about

2    free riding issues, that it's more of

3    something that the industry likes to talk

4    about.

5             Everyone knows that there's a

6    free rider problem in the Unified Patents

7    model just like there is in every single

8    type of trade association type effort where

9    you're working on behalf of a technology

10   area or zone, there are going to be some

11   people who are going to both have the budget

12   and the interest in seeing that work done

13   and they are going to be willing to chip in

14   and pay for it.  And there will be companies

15   who will either not have the budget or not

16   have the interest in paying for it.

17             I don't really consider those to

18   be -- anyway, this is the kind of free rider

19   type conversation and this is something that

20   doesn't really come up in the sense that

21   like everyone knows that Unified is never

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 158 of 209

Page 159

1    going to get 100 percent of every company

2    that is in a zone to participate.  So it's

3    not really a topic.

4        Q.    My experience with Samsung is

5    they're very concerned with ▮ and is part

6    of the reason why Samsung is keeping their

7    membership confidential because they don't

8    want ▮ to know about it?

9            MR. FAWZY:  Objection.  Calls for

10   speculation.

11           THE WITNESS:  I was going to say,

12   you're going to have to ask them why they

13   want to keep their membership agreement

14   confidential.

15           BY MR. HARRINGTON:

16       Q.    Were you involved with the

17   negotiation of the membership agreement?

18       A.    I was, yes.

19       Q.    Do you recall why they told you

20   they wanted to keep their membership

21   confidential?

Kevin Jakel   Confidential
October 15, 2019                                    160

Page 160

1          A.    I do not recall them specifically

2     saying why they wanted to keep their

3     membership confidential.  But I can say that

4     back then, they were not super early

5     adopters, but they were relatively early

6     adopters.  And back then, everyone was, for

7     the most part, keeping -- the vast majority

8     of our membership was keeping their

9     memberships confidential.

10               And over time, that has relaxed

11    some.  So now we're in a situation where a

12    lot of companies, you know, have not kept

13    their membership confidential.  So we're now

14    at a point where the vast majority of the

15    existing companies that are confidential are

16    companies that signed up kind of early on

17    and just haven't changed their position.

18         Q.    Aside from the cable company

19    trade association that we discussed earlier,

20    have other members signed up together?

21         A.    No.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 160 of 209

1        Q.    So that's the only group that

2   came together as a package for the

3   membership?

4        A.    Well, I mean, I wouldn't say they

5   came together.  We pitched CableLabs on this

6   and they liked the idea.  And so we

7   certainly have not talked to all the cable

8   companies.  There's a lot of them.  We've

9   never spoken to most of them.

10       Q.    Have you ever done a pitch to

11   multiple companies at the same time?  For

12   example, ███████ and ██, say, hey, we're in

13   Korea, we'll just meet with both of you guys

14   at the same time?

15       A.    We have never met with ██and

16   Samsung together.

17       Q.    That was an example.  Are there

18   other companies which you have pitched them

19   together?

20       A.    The only thing I could say that

21   maybe would qualify for that is, you know,

Kevin Jakel   Confidential
October 15, 2019                                    162

Page 162

1    I've pitched Unified to groups of companies

2    at conferences, said, hey, this is what we

3    do.  If you've got any interest in

4    participation, you know, come see me after

5    the talk.

6              But in terms of organizing

7    pitches, I can't recall any situation where

8    more than one company pitched, other than

9    like talking to industry groups, right?  I

10   mean, conferences and things like this.  But

11   in terms of two companies getting together

12   and saying, hey, let's go talk to Unified

13   together, that has never happened.

14        Q.   Does Unified have any written

15   policies?

16        A.   We have an employee handbook.

17        Q.   Do you have any policies about

18   under what conditions it will file an IPR?

19        A.   No.  We don't have like a written

20   policy on how we file IPRs.

21        Q.   Does Unified have any written

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 162 of 209

Page 163

1    policies about what information it will

2    receive and accept from its members?

3        A.    We do not, no.

4        Q.    Did anyone send you -- and you, I

5    mean Unified -- a copy of the American

6    Patents patents?

7        A.    No.

8        Q.    How many IPRs has Unified file

9    where a member has not been sued?

10       A.    I think --

11       Q.    Let me just -- outside of the SEP

12   context.

13       A.    Yeah.  So I figured that's what

14   you meant.  I think it's a couple dozen or

15   in that ballpark.  I don't know the exact

16   number.

17       Q.    And how were those patents

18   chosen?  So based on the assignment records

19   and things like that?

20            MR. FAWZY:  I'm going to object

21   on the basis of privilege.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 163 of 209

Kevin Jakel  Confidential
October 15, 2019                                      164

Page 164

1              THE WITNESS:  So I think what I

2      can say without talking about the specifics

3      of any patent is that all of those would

4      have gone through the same process that all

5      of our patents kind of go through, which is

6      that when we look at a patent and we

7      identify it as being like meeting the zone

8      definition, then we take that and we start

9      looking at it from the perspective of if we

10     were to file an IPR on this particular

11     patent, would it generate a deterrence that

12     we think other NPEs of all various types

13     would see and would it generate that kind of

14     deterrence for us.

15              So all of our IPRs are not based

16     on whether or not a member has been sued or

17     not.  It just also happens that we have

18     NPE -- or sorry, it so happens that we have

19     members, some of which are some of the

20     biggest companies in the world, and so if

21     you are going to be doing work for a zone,

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 164 of 209

Kevin Jakel  Confidential
October 15, 2019                                165

1    you are going to have kind of lots of

2    overlap between the work we do on behalf of

3    the zone and the fact that those patents

4    will sometimes get used against some of the

5    biggest companies of the world.

6              And so the overlap is something

7    that is a function of the fact that we

8    happen to be working in technology areas

9    that are really important and lots of

10   companies sell products in.  But when we

11   look at whether or not we're going to file

12   an IPR, our question is not, hey, someone's

13   been sued.

14             The reason is, is we have no way

15   of knowing whether or not filing an IPR will

16   actually have a positive impact on someone's

17   litigation.  Our claim constructions.

18   You're a litigator.  You know exactly how

19   important claim constructions are to both

20   infringement and validity.  We don't know

21   what our members' invalidity contentions

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 165 of 209

Kevin Jakel  Confidential
October 15, 2019                              166

Page 166

 1   are.  They would never share those with us

 2   and we would never ask for them and so we

 3   are completely separate and independent on

 4   those.

 5              We could very well be throwing a

 6   hand grenade by putting a claim construction

 7   out there into the public domain and have

 8   the board choose a claim construction that

 9   ends up being almost exactly the opposite to

10   the claim construction that a member has

11   chosen to navigate their both infringement

12   versus validity analysis.  And you know as

13   well as I do how important and critical it

14   is to all litigation to have a claim

15   construction that meets both of those.

16              Like we don't know what our

17   members' claim construction strategies are

18   either on infringement or on validity.

19   We're completely in the dark.  The idea of

20   us being able to pick a patent, whether it's

21   been in litigation with a member or not in

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 166 of 209

Kevin Jakel  Confidential
October 15, 2019                    167

1    litigation with a member, the idea -- and as

2    you correctly pointed out earlier, there are

3    probably lots of companies that are members

4    of ours and nonmembers of ours that are

5    engaged in licensing, but are not yet

6    engaged in litigation.  So they might have

7    their own like strategies around how to

8    handle a particular patent.

9              The idea that Unified could

10   somehow contact all of its members and

11   navigate a strategy of coming up with a

12   single IPR that fit the legal strategies of

13   what could be dozens and dozens of companies

14   and somehow coordinate all of that is

15   exactly why, when I founded the company, I

16   was like, no, we're not going to -- none of

17   this.  We're not going to do this.  We're

18   going to be a complete independent third

19   party and what we're going to run out there

20   and do is create our own independence, our

21   own independent deterrence for a zone.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 167 of 209

Kevin Jakel  Confidential
October 15, 2019                                    168

Page 168

1              So these companies I can say

2     would have gone through that exact -- or

3     these IPRs where no member was in litigation

4     would have gone through the same analysis

5     regardless of whether or not a member was in

6     active litigation or not because we just --

7     we're not structured and designed and

8     literally it's an impossible task to kind of

9     coordinate this.

10             The company was always designed

11    to have dozens and dozens and dozens of

12    members, not just one or two.  I mean, you

13    could possibly negotiate and navigate these

14    kinds of issues if you only had one or two

15    companies in your membership, but that was

16    never the goal.  In order to run Unified, we

17    knew from the beginning you had to just

18    simply step back and be completely

19    independent and not try to navigate any of

20    these legal kind of land mines in terms of

21    doing this work.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 168 of 209

Kevin Jakel  Confidential
October 15, 2019                                    169

Page 169

1              BY MR. HARRINGTON:

2        Q.    Is the reason that Unified

3    designed this independence within its

4    business practice and its policies, was that

5    specifically so that it wouldn't generate

6    estoppel for its members?

7              MR. FAWZY:  Object to the form.

8    Calls for a legal conclusion and calls for

9    speculation.

10             THE WITNESS:  So the answer is

11   no.  But it's more complex than that.  I

12   mean, having been an outside litigator and

13   been involved in joint defense groups and

14   having been an in-house counsel

15   participating in joint defense groups and

16   having kind of worked on both sides of all

17   of these issues, what I ultimately kind of

18   saw as like a business opportunity back when

19   I started the company was can I actually get

20   outside of that situation.

21             I need to be -- if I want to do

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 169 of 209

Kevin Jakel   Confidential
October 15, 2019                                        170

Page 170

1    what I want to do, I can't negotiate and run

2    this kind of -- these legal negotiations

3    with dozens and dozens of companies.  Like

4    it just -- it would be an impossible

5    situation for me to get -- I mean, a claim

6    construction or a piece of prior art or any

7    of the other aspects of how you might create

8    deterrence.

9                In order to get everyone kind of

10   on the same page, I recognized right from

11   the beginning that you would never get

12   outside counsel who are sitting on joint

13   defense calls and every single lawyer thinks

14   that they are the smartest lawyer on the

15   call and no two like egos will allow the

16   other party to kind of drive the legal

17   strategy.

18               So in order for Unified to get

19   out of that environment and truly operate as

20   a third party, estoppel's one of those

21   aspects where like if someone's a real party

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 170 of 209

1    in interest, then they're going to obviously

2    get sucked into this.  And so like this is

3    all kind of mixed together, which is, yeah,

4    I want this -- I want to be independent and

5    I don't want to be sucked into that joint

6    defense group nightmare.

7              In order to do that, I also can't

8    let anyone be a real party in interest.  And

9    so that's the -- you know, we -- I saw very

10   early on that in order to get away from the

11   first problem, I had to also make sure that

12   no one was going to be able to exert any

13   control over us so that I could be -- so

14   that I would be able to remain independent

15   and do what I wanted to do without being

16   stopped.

17              BY MR. HARRINGTON:

18        Q.    Have you ever had any

19   conversations with members or potential

20   members about IPR estoppel?

21        A.    Not for many years.  I mean, the

Kevin Jakel  Confidential
October 15, 2019                                   172

Page 172

1    speech I just gave you today is -- just now

2    is the speech of what I gave everybody else,

3    which was, hey, I want to go out and create

4    deterrence on behalf of a zone.

5              In order to do that, I am going

6    to need to be completely independent because

7    you're not going to be the only one in the

8    zone.  It's going to be dozens of people in

9    the zone and we are going to want to be able

10   to act independently and I can't kind of

11   work with all of you.  The whole idea is

12   that we're going to do our own thing and

13   you're not going to be part of it.

14             That also would come into, well,

15   does that mean that we wouldn't be real

16   parties in interest?  And I was like, yes,

17   this is part of what we're going to do.

18   We're going to remain independent.  And the

19   way we're going to guarantee that that's

20   going to be the case is we're going to

21   behave this way.  We're going to work this

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 172 of 209

1   way.  And I'm going to be able to prove

2   that.

3              I mean, from day one, I've always

4   been telling people I will give depositions,

5   I will tell you what my conversations with

6   companies look like, we will be transparent,

7   not just with the board and with patent

8   owners.  We'll intentionally be willing to

9   sit down because I think everyone tries to

10  say, you know, is Unified really doing what

11  it said it was going to do?  And we are

12  doing what we said we are going to do.  But

13  in order to prove that, we've got to sit

14  down and have these conversations.

15             So we did discuss the overall

16  structure of how Unified was going to

17  structure itself because we told people this

18  is what my vision for the company is.

19  Independence, we're going to go out, we're

20  going to do what we want to do in order to

21  create a deterrent for the zone and that

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 173 of 209

Page 174

1    deterrent will basically, you know, will

2    help kind of like all ships rise with the

3    tide type pitch.  And that was something

4    that, in the context early on of, hey, you

5    know, how's that going to work?  I would say

6    this is how it's going to work.

7              So we haven't had conversations

8    about estoppel for kind of a very long time,

9    but obviously in the beginning of explaining

10   how I envisioned Unified working, real party

11   in interest and a stock hold were question

12   marks about how we were going to organized

13   and how we were going to maintain our

14   independence.

15        Q.    Is anybody asserting that one of

16   Unified's members is a real party in

17   interest currently in the litigation?

18        A.    I guess --

19              MR. FAWZY:  Could you repeat the

20   question?

21              BY MR. HARRINGTON:

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 174 of 209

Page 175

1        Q.      Are you aware of any patent owner

2    asserting that Unified -- one of Unified's

3    members is a real party in interest in a

4    Unified IPR that Unified lost?

5        A.      I mean, I'm not aware of that.

6    It would require them to be claiming that

7    the company is estopped from using a piece

8    of prior art.

9        Q.      Yes.

10       A.      And -- I mean, I have no idea.

11   We are not keeping track of our members'

12   litigation to see that.  I mean, I don't --

13   I have not yet seen it.

14       Q.      So you haven't been subpoenaed

15   for a litigation in which that's happened?

16       A.      We have been subpoenaed and we

17   quashed those subpoenas because we give

18   discovery here.  But in all of those cases,

19   the allegation is not -- there's estoppel.

20   The allegation -- they're basically trying

21   to use the district court discovery tools to

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 175 of 209

Page 176

```
 1    try and get discovery from us, but not

 2    because -- in those situations, the IPR is

 3    just ongoing, not -- so they're just trying

 4    to get information.  But they're not --

 5    there's no estoppel being argued in court

 6    that there is -- that a member has been --

 7    is estopped from making an argument in

 8    district court litigation.

 9              You know, like the IPR hasn't

10    even finished yet.  We're like right in the

11    middle of it.  They're trying to take

12    discovery from us through the district court

13    means through third-party subpoena and we

14    quashed them.

15       Q.    Yeah, I get that.  I'm just

16    saying so no one has yet gotten through an

17    IPR against Unified, won that IPR and then

18    said, hey, now your members are estopped?

19    No one, as far as you're aware, has taken

20    that position or has informed Unified of

21    that?
```

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 176 of 209

Kevin Jakel  Confidential
October 15, 2019                                         177

Page 177

1        A.     I have not heard of an estoppel

2   argument has been made in district court.

3               MR. FAWZY:  Are we --

4               MR. HARRINGTON:  Getting close.

5               MR. FAWZY:  -- getting close or

6   should we take a break?

7               MR. HARRINGTON:  No, I'm getting

8   close.  Let's just -- can we mark as Exhibit

9   4 a Unified patent press release.

10               (Exhibit No. 4 was marked for

11   identification.)

12               BY MR. HARRINGTON:

13        Q.     Do you recognize this document?

14        A.     We do, yes.

15        Q.     What is this document?

16        A.     This looks like a printout -- we

17   have like a blog, I guess, something akin to

18   that, on our webpage where we kind of post

19   about all sorts of different activities and

20   things that involve us.  And we have a page

21   which tracks real party in interest

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 177 of 209

Kevin Jakel   Confidential
October 15, 2019                                178

Page 178

1    decisions and this is where we keep all that

2    information so that it could be accessed.

3         Q.    So this is Unified advertising

4    its victories defending against real party

5    in interest claims, correct?

6         A.    I wouldn't say it is advertising,

7    but this is where we keep our kind of a

8    record of this.  It makes it really useful

9    to keep it in place because it's a resource

10   for the legal team, too, to go back and have

11   a summary of every one of the cases.

12        Q.    What other legal issues does

13   Unified do that for?

14        A.    Off the top of my head, I don't

15   know.  It's possible that we do.

16        Q.    As far as you're aware today,

17   this is the only legal issue in which

18   Unified publishes it and explains its

19   various victories on a particular issue?

20        A.    As far as I know, yeah.

21        Q.    Can you give me an approximate

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 178 of 209

Page 179

1    percentage of the IPRs which you file in

2    which another party's real party in interest

3    status is challenged?  If it's a confusing

4    question, I can reword it.

5          A.     All of them involve Matt.

6          Q.     For the record, there was a wink.

7          A.     Yeah.

8          Q.     I'm not sure that's correct.

9          A.     Well, that was just a joke.  So

10   off the top of my head, I don't know.  I'll

11   tell you that in the beginning of starting

12   Unified, there were lots of entities that

13   tried to challenge real party in interest.

14              By the time we got a few years in

15   and companies started, I guess, recognizing

16   that when we produced discovery and when we

17   were deposed and we went through this, that

18   we were accurately representing like the

19   facts as we put them in our kind of

20   voluntary rogs, we've always tried to just

21   be transparent about how we did it.  And the

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 179 of 209

Page 180

1    voluntary rogs were designed to give patent

2    owners and the board something that they

3    could kind of rely on.

4              So after a few years of going

5    through that, the challenges for real party

6    in interest dropped off to a pretty low

7    rate, I guess.  And then basically RPX and

8    the AIT case came out and at that point,

9    every -- I think everyone who was an NPE

10   really wanted to read AIT to assume that the

11   fed circuit had completely rewritten the

12   real party in interest analysis.

13             That wasn't our read of it and I

14   don't think that's any -- I don't think

15   that's anyone's real read of it.  But there

16   were lots of like new cases that kind of

17   came out after AIT and we want everyone -- I

18   mean, this list of real party in interest

19   decisions, we want it to be transparent.

20   People want to depose me and they want to

21   find out what we did and how we did it.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 180 of 209

Kevin Jakel   Confidential
October 15, 2019                                   181

Page 181

 1                We voluntarily make myself

 2     available for a deposition and we give

 3     discovery about anything that's related to

 4     the patent to give everyone knowledge that,

 5     like, we're not having conversations with

 6     anyone about specific patents.  No one is

 7     giving us suggestions about particular

 8     patents, you know, no types of patents have

 9     been identified of which ones they want us

10     to go after.

11                I mean, all of the kind of new

12     kind of discovery stuff that has happened in

13     this particular case, we don't have any side

14     agreements, no verbal agreements, none of --

15     we basically say, hey, we're going to go to

16     work for a zone.  You can't control what we

17     do.  You can't tell us to make any

18     suggestions or any of those things.

19                And this list that we have here

20     with the real party in interest decisions is

21     part of what we want to be like our effort

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 181 of 209

Page 182

1    at transparency.  Like this lists everything

2    out and we're going to then continue going

3    forward to give voluntary discovery in the

4    form of our voluntary rogs to say, hey, you

5    know, we didn't -- we're not kind of

6    communicating with a member or nonmember

7    behind the scenes to take action here.  This

8    is kind of our own -- this is our own

9    independent thing and this decision -- this

10   list of decisions we think is important

11   because a lot of these decisions are based

12   on someone taking discovery, sitting down

13   with me, going all the way through this and

14   then us having like a set of facts that go

15   out there.  This is what we think is a big

16   part of kind of setting the stage and being

17   transparent with us, the patent owners, the

18   board members, nonmembers, everyone can

19   figure out how it is that Unified works.

20        Q.    If Unified's trying to be

21   transparent, why didn't Unified produce all

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 182 of 209

Kevin Jakel   Confidential
October 15, 2019                            183

Page 183

1    of its communications with Samsung in this

2    case?

3              MR. FAWZY:  Objection.  That's a

4    legal -- that's a discovery legal issue.

5    Calls for speculation.  Vague.

6              THE WITNESS:  Because this is

7    crazy burdensome to generate every single

8    communication between us.

9              BY MR. HARRINGTON:

10       Q.    Well, earlier I think you said it

11   was between 100 and 200 emails, right?

12       A.    That's right.

13       Q.    That doesn't seem that burdensome

14   to produce 100 to 200 emails.  And if

15   there's not much to them, why wouldn't you

16   produce them?

17             MR. FAWZY:  Objection.  Same

18   objections.

19             THE WITNESS:  I mean -- so

20   basically I also think that we're not

21   required to, so we don't have to.  But in

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 183 of 209

Page 184

1    the interest of transparency, we did turn

2    over any communications at all that had

3    anything to do with American Patents and

4    you -- sorry, American Patents and us.  So

5    all communications that actually mentioned

6    you we did turn over.  So this is -- I think

7    that's pretty transparent.

8              And in this case, we've gone even

9    further, which is to look for any

10   communication at all where a member would

11   have identified either a type or there would

12   have been a suggestion or something where

13   they would have said, hey, we want you to go

14   after something like this.  Those

15   communications don't exist and we actually

16   complied entirely with the Board's request

17   for that information and we gave it to you

18   voluntarily.

19              MR. FAWZY:  And for the record,

20   the discovery that was produced to us prior

21   to agreement between the parties.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 184 of 209

Page 185

1              BY MR. HARRINGTON:

2        Q.    From a business perspective, is

3    it important that Unified's members are not

4    deemed real party in interests for Unified's

5    IPRs?

6        A.    I don't know.  So, I mean, in

7    terms of real party in interest, what we

8    want to do is not get bogged down in trying

9    to work with all of our companies to kind of

10   navigate the legal issues that we talked

11   about earlier.

12              And do I think that that's

13   important for Unified?  Yeah, I think that's

14   important that we are able to kind of

15   maintain independence so that I don't have

16   to be part of what would be a joint defense

17   group and have to figure out all the various

18   ways that we could take action.

19              Unified wants to be independent

20   and we want to be able to create the

21   deterrence for the zones in whatever way we

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 185 of 209

Page 186

1    see fit.  And so this is something that

2    we -- that independence is really important

3    to us.  What falls out of that independence

4    is kind of real party in interest.  But the

5    independence comes first for us because we

6    don't want to -- I've been part of joint

7    defense groups so many times and felt like

8    they were unbelievably inefficient and

9    difficult to navigate.  So my goal as a

10   lawyer, I guess, is to never participate in

11   another joint defense group again.

12       Q.    That's my goal, too.

13             MR. HARRINGTON:  That's all I

14   have.

15             MR. FAWZY:  All right.  I just

16   need a minute or two just to see if I have

17   any follow-up questions.

18             (Brief Recess.)

19             MR. FAWZY:  Just a couple of

20   questions.

21             MR. HARRINGTON:  Sure.

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 186 of 209

Page 187

```
 1                    EXAMINATION

 2              BY MR. FAWZY:

 3       Q.     So, Mr. Jakel, earlier we were

 4  going over the membership agreement which is

 5  included in Exhibit 3.  On page UP0005,

 6  ███████████  of the agreement, do you see

 7  that section?

 8       A.     Yes.

 9       Q.     Could you please explain that

10  section to me and what it means and what its

11  obligations entail?
```

Page 188

[REDACTED]

10        Q.     And earlier also you were talking

11   about, right before our second break, you

12   were talking about I think what happens when

13   Unified settles and takes a license --

14   enters into a license agreement or sells one

15   of its IPR and how that is structured with

16   regards to [REDACTED]

17   [REDACTED]

18   [REDACTED]

19             Do you recall that testimony you

20   gave earlier?

21        A.     I think so, yes.

Page 189

```
 1          Q.     And just to clarify for the

 2   record, because I think we were talking

 3   about the membership agreement, but then we

 4   were also talking about the standard or the

 5   typical settlement agreement that Unified

 6   would enter into.  Your testimony with

 7   regards to Unified taking a license and that

 8   license ███████████████████████████████████

 9   ██████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████

12               Do you recall that testimony?

13          A.     I do.

14          Q.     And that is the standard, typical

15   settlement agreement that Unified has

16   entered into in the past; is that correct?

17          A.     That's correct.
```

Page 190

███████████████████████████████

█████████████████████████████████

███████████████████████

```
 4        Q.    And are any of your

 5    communications with members privileged?

 6        A.    No.

 7              MR. FAWZY:  That's it.  I don't

 8    have any further questions.

 9              (Reading and signing reserved.)

10              (Deposition concluded 1:39 p.m.)

11

12

13

14

15

16

17

18

19

20

21
```

Kevin Jakel   Confidential
October 15, 2019                                                  191

Page 191

1                 CERTIFICATE OF COURT REPORTER

2                 I, MARY GRACE CASTLEBERRY, do

3     hereby certify that the proceedings were

4     recorded by me stenographically and

5     electronically at the time and place

6     mentioned on the cover sheet thereof, and,

7     thereafter, transcribed; that said hearing

8     is a true record of the statements made;

9     that I am neither counsel for, related to,

10    nor employed by any of the parties to this

11    proceeding;

12                And further, that I am not

13    financially or otherwise interested in the

14    outcome of this matter.

15                As Witnessed by my hand and

16    signature as indicated below.

17

18

19    ----------------------------------------
                  MARY GRACE CASTLEBERRY, RPR
20

21

U.S. LEGAL SUPPORT
1-800-567-8757

American Patents LLC - Exhibit 2021
Unified Patents, Inc. v. American Patents LLC
IPR2019-00482
Page 191 of 209